KAREN NELSON MOORE, Circuit Judge.
When individuals in this country are unable to work because of physical or mental disabilities, they may file for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. The eleven plaintiffs here all filed for these benefits, and they all eventually received them. The trouble, however, is that they were represented in their efforts by Eric Conn, a Kentucky attorney who secured benefits for his clients by submitting fraudulent reports to the Social Security Administration ("SSA"). An Administrative Law Judge ("ALJ"), David Daugherty, also participated in the scheme by taking *792 bribes from Conn to assign Conn's cases to himself and issue favorable rulings.
Nearly ten years after the SSA first learned of Conn's and Daugherty's possible wrongdoings, it initiated efforts to "redetermine" plaintiffs' eligibility for benefits. The SSA held new hearings before new ALJs to determine plaintiffs' entitlement to benefits as of the date of their original applications-i.e., seven to ten years earlier. During the redetermination process, the SSA disregarded all medical evidence submitted by the four doctors participating in Conn's scheme on the ground that such evidence was tainted by fraud. Plaintiffs had no opportunity to rebut the agency's assertion of fraud as to this medical evidence. Ultimately, all plaintiffs were deemed ineligible for SSDI and SSI benefits as of the date of their original applications, and their benefits were terminated. After exhausting all administrative remedies, plaintiffs brought suit in federal district court.
The eleven cases presented in this consolidated appeal appeared before three different district judges. Though the precise nature of their claims somewhat varied, all plaintiffs alleged that the SSA's procedures and actions violated the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act ("APA"), and the Social Security Act. We now hold that the plaintiffs are entitled to summary judgment on their due-process claim, the SSA is entitled to summary judgment on plaintiffs' claims under the Social Security Act, and the SSA is not entitled to summary judgment on plaintiffs' claims under the APA. We therefore AFFIRM the district court's judgment in cases numbered 17-5206, 17-5211, 17-5212, 17-5213, 17-5214, 17-5215, 17-5216, and AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion in cases numbered 17-5598 and 17-5614.
I. BACKGROUND
The SSDI and SSI programs provide disability benefits to individuals with physical or mental impairments that preclude them from working. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The eleven plaintiffs in this consolidated appeal had each applied for SSDI and/or SSI benefits between June 2006 and October 2008, and their applications were initially denied. Either before or after these initial denials, each plaintiff retained Eric Conn, a Kentucky attorney, to assist with the application process. With Conn's counsel, each plaintiff then submitted a timely request for a hearing before an ALJ. In each of these cases, the plaintiff's application included medical records from one of four examining doctors-Bradley Adkins, Ph.D., Srinivas Ammisetty, M.D., Frederic Huffnagle, M.D., or David P. Herr, D.O. And in each of these cases, ALJ David Daugherty relied exclusively on the doctors' medical opinions to conclude on the record (i.e., without holding a hearing) that plaintiffs were disabled and thereby entitled to either SSI or SSDI benefits. In particular, in each case Daugherty's discussion of his determination to award benefits read, more-or-less verbatim, as follows:
Having considered all of the evidence, I am satisfied that the information provided by Dr. [Adkins, Ammisetty, Huffnagle, or Herr] most accurately reflects the claimant's impairments and limitations. Therefore, the claimant is limited to less than sedentary work at best.
After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, and that the *793 claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible.
E.g. , 16-cv-53 (Blackburn), R. 26-1 (Ex. 6A, Daugherty Decision at 3) (Page ID #281).
According to the SSA, plaintiffs' change of fortune was not coincidental. Instead, SSA alleges that Conn, Daugherty, and the four doctors identified above were engaged in a widespread scheme to secure SSI and SSDI benefits for Conn's clients based on fraudulent disability applications. SSA Br. at 12-15. The scheme, according to the SSA, worked like this: Conn created a limited number of template Residual Functional Capacity ("RFC") forms, which he or attorneys in his office filled out ahead of time. Id. at 13. These forms, which are normally meant to convey a claimant's "ability to do work-related activities on a day-to-day basis in a regular work setting," 16-cv-154 (Hicks), R. 42-2 (Adkins Report, RFC Form) (Page ID #1438), were purportedly manipulated to ensure that they satisfied the SSA's criteria for establishing a disability. Id. The doctors above then signed these forms without making any adjustments, and Conn submitted the forms to the SSA on behalf of his clients. Id. Daugherty, who was allegedly receiving bribes from Conn, then assigned Conn's cases to himself and issued favorable rulings to Conn's clients. Id. at 14-15; Pls. Br. at 4.
The SSA first learned about possible wrongdoing involving Daugherty and Conn as far back as 2006, when a senior case technician and a master docket clerk in the SSA's Office of Disability Adjudication and Review (which houses the ALJs) raised concerns that Daugherty was reassigning Conn's cases to himself and rapidly deciding them in the claimants' favor. U.S. ex rel. Griffith v. Conn , No. CIV. 11-157-ART, 2015 WL 779047, at *1-2 (E.D. Ky. Feb. 24, 2015). A Wall Street Journal article published in May 2011 highlighted Daugherty's practice of taking Conn's cases and awarding benefits and noted that "[a] possible connection between Messrs. Daugherty and Conn is a subject of the inspector general's investigation." Damian Paletta, Disability-Claim Judge Has Trouble Saying "No," Wall St. J., May 19, 2011. Also in 2011, the U.S. Senate Committee on Homeland Security and Governmental Affairs launched an investigation into Daugherty's unusually quick adjudication of disability claims and unusually high rate of granting benefits. The Committee issued a report in October 2013 finding that "Judge Daugherty worked with Mr. Conn in inappropriate ways to approve a high volume of cases submitted by the Conn Law Firm." Senate Committee on Homeland Security and Governmental Affairs, How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm 5 (Oct. 7, 2013) [hereinafter, Senate Report], available at https://www.hsgac.senate.gov/imo/media/doc/REPORT%20Conn%20case%20history%20report-final%20%20(10-7-13).pdf.
After the Wall Street Journal article was published, but before the SSA took any steps to initiate redetermination proceedings in these cases, Conn purportedly made significant efforts to destroy records, "including medical records for active disability claims." Id. at 121. According to the Senate Report, a shredding company sent Conn an invoice on June 23, 2011 for the destruction of more than 26.5 thousand pounds of documents for the Conn Law Firm, which is, according to the Report, the equivalent of 2.65 million sheets of paper. Id. at 122. Before the article, the shredding company had previously shred documents for Conn in smaller batches *794 (e.g., 5.6 thousand pounds of paper in June 2010; 5.9 thousand pounds of paper in September 2010; and 7.3 thousand pounds of paper in November 2010). Id. An affidavit submitted by a former Conn Law Firm employee in one of the cases below confirms that medical records "were destroyed by fire or by shredding, although not all medical records were destroyed." 16-cv-154 (Hicks), R. 22-1 (Slone Aff. ¶ 3) (Page ID #1082). This former employee also averred that "[i]t was routine practice in Mr. Conn's office not to submit any medical records to Social Security or the Office of Disability Adjudication and Review on a claimant's claim once they were assigned to Judge David B. Daugherty." Id.
By July 2014, the Social Security Administration's Office of the Inspector General ("OIG") had identified 1,787 individuals-all of whom had been represented by Conn-whose applications, the OIG "had reason to believe," were tainted by fraud. 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146). This tag has statutory significance. Under the Social Security Act, the SSA is required to "immediately redetermine" a beneficiary's entitlement to disability benefits if, at any point after granting benefits, the SSA has "reason to believe that fraud or similar fault was involved in the application" for benefits. 42 U.S.C. § 405(u)(1)(A). The SSA may, however, delay redetermination proceedings if "a [state or federal prosecutor] with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud." Id. Notwithstanding the SSA's clear statutory mandate to "immediately redetermine" benefits upon suspicion of fraud, id. , the OIG provided the 1,787 names to the SSA "with the understanding that SSA was not to take any adverse action against any individual on the list until further notice." 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146).
On May 12, 2015, the OIG sent the SSA another letter stating that the OIG "still has[ ] reason to believe" that fraud was involved in the 1,787 applications identified in July 2014. Id. In particular, the OIG explained that it "has[ ] reason to believe that Mr. Conn or his firm submitted pre-completed 'template' Residual Functional Capacity forms purportedly from [the four doctors identified above], dated between January 2007 and May 2011, in support of the individuals' applications for benefits." Id. The OIG noted that it was "not aware of any objections to SSA moving forward with its administrative processing of the redeterminations of the 1,787 individuals" previously identified by the OIG and told the SSA "that it may proceed with its redetermination of the cases of the individuals on the previously transmitted list."Id.
With that, the SSA sent letters on May 18, 2015 to each of the eleven plaintiffs in this case (along with approximately 1,500 other individuals, see 16-cv-154 (Hicks), R. 25-1 (Salzmann Aff. ¶ 5) (Page ID #1125) ). Citing sections 205(u) and 1631(e)(7) of the Social Security Act ( 42 U.S.C. §§ 405(u), 1383(e)(7)(A) ), the letters explained that the SSA needed to redetermine plaintiffs' eligibility for benefits because "there was reason to believe fraud was involved in certain cases involving [Adkins, Ammisetty, Huffnagle, and Herr]," one or more of these doctors "provided evidence" in plaintiffs' cases, and the ALJ (i.e., Daugherty) "previously used that evidence to find [plaintiffs] disabled." E.g. , 16-cv-154 (Hicks), R. 20-4 (Notice of Appeals Council Action at 1) (Page ID #339). The letters further explained that during the redetermination process, the SSA "must disregard *795 any evidence from one of the medical providers above when the information was submitted by representative Eric C. Conn or other representatives associated with Mr. Conn's law office." Id.
According to the May 18, 2015 letters, the SSA had already reviewed plaintiffs' cases (less than a week after receiving notice from the OIG that it could proceed with the redetermination process) and had concluded that the remaining evidence in plaintiffs' files did not support their favorable benefits determinations. Id. at 2 (Page ID #340). As a result, the plaintiffs' cases were being remanded to a new ALJ for a redetermination hearing. Id. The letters informed plaintiffs that they could obtain representation for the hearing and could submit more evidence to the ALJ, which the SSA would consider so long as it was "new and material" and concerned plaintiffs' disabilities on or before the date of Daugherty's initial decision. Id. at 3-4 (Page ID #341-42). In an affidavit submitted in the Hicks district court proceedings, a division chief administrative appeals judge explained that beneficiaries may also receive assistance, if they request it, "with developing records that are new, material, and related to the period at issue" during the redetermination process. 16-cv-154 (Hicks), R. 25-1 (Salzmann Aff. ¶ 6) (Page ID #1125). In addition, "the ALJ may obtain medical or vocational expert testimony as necessary." Id.
The SSA held new hearings in plaintiffs' cases between December 2015 and March 2016. In each hearing, the new ALJ disregarded the medical reports initially submitted by Adkins, Ammisetty, Huffnagle, or Herr, considered all other medical evidence in plaintiffs' files, including newly submitted evidence that satisfied the two criteria above, and concluded that plaintiffs should not have been awarded benefits in the first place. E.g. , 16-cv-53 (Blackburn), R. 26-1 (Redetermination Decision at 13-25) (Page ID #212-24). The ALJs therefore "terminated" plaintiffs' benefits and informed plaintiffs that the "SSA may treat any benefits previously received as an overpayment." Id. at 24 (Page ID #223). The ALJs further instructed plaintiffs that they "have the right to file a new application at any time." Id. at 11 (Page ID #210).
Notably, in redetermining plaintiffs' eligibility for benefits, the SSA excluded all evidence submitted by Adkins, Ammisetty, Huffnagle, and Herr-not just the RFC forms that the OIG had identified as possibly fraudulent in its referral to the SSA.[1] See 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146). Beyond the RFC forms, the four doctors had submitted evidence detailing their examinations of plaintiffs, including any testing that they had performed and behavioral observations they had made. For Hicks, for instance, Dr. Adkins submitted a report stating that he had examined Hicks for three-and-a-half hours and had administered a third-edition Wechsler Adult Intelligence Scale test ("WAIS-III"). 16-cv-154 (Hicks), R. 42-2 (Adkins Report at 1) (Page ID #1429). Adkins determined that Hicks had an IQ of 69 and a Global Assessment of Functioning ("GAF") score of 47. Id. at 6, 8 *796 (Page ID #1434, 1436). No other IQ testing appears in Hicks's records, and the only other GAF score discussed in the ALJ's redetermination decision was higher (65-70), and had been obtained by an SSA-retained physician. 16-cv-154 (Hicks), R. 20-3 (Redetermination Decision at 20) (Page ID #254). Without the benefit of Adkins's report, the ALJ concluded that Hicks's "medically determinable mental impairment causes no more than 'mild' limitation" and therefore "did not significantly limit [her] ability to perform basic work activities." Id. at 21-22 (Page ID #255-56).
After exhausting their administrative remedies, plaintiffs sought relief in federal district court. Plaintiffs challenged the SSA's procedures, actions, and decisions as violations of the Social Security Act, the Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act. See, e.g. , 16-cv-154 (Hicks), R. 1 (Compl. ¶¶ 11-20) (Page ID #3-4). Seven of the cases proceeded before Judge Thapar (Hicks, Adams, Blackburn, Hale, Jenkins, Justice, and Ousley), which are referred to collectively here as Hicks v. Colvin ; three cases proceeded before Judge Reeves (Griffith, Howard, and Martin) and were decided together under the name Carter v. Colvin ; and one case proceeded before Judge Hood (Perkins v. Colvin ).
Judge Thapar focused first on Hicks, where he decided the constitutional due-process claim in Hicks's favor and granted partial summary judgment to Hicks on that ground on October 12, 2016. 16-cv-154 (Hicks), R. 36 (Mem. Op. & Order) (Page ID #1328-60). He then issued an order in each of the other six cases applying the Hicks opinion to them. E.g. , 16-cv-53 (Blackburn), R. 39 (Order) (Page ID #854-55). The SSA moved for reconsideration of the Hicks opinion, which Judge Thapar denied on December 21, 2016. 16-cv-154 (Hicks), R. 48 (Mem. Op. & Order) (Page ID #1608-21). In the meantime, Judge Reeves rejected plaintiffs' statutory and constitutional claims regarding the SSA's redetermination procedures in Carter and granted partial summary judgment to the SSA on November 15, 2016.[2] E.g. , 16-cv-101 (Griffith), R. 43 (Mem. Op. & Order) (Page ID #950-89). Judge Hood largely adopted Judge Reeves's opinion and granted partial summary judgment to the SSA in Perkins on December 16, 2016. 16-cv-35 (Perkins), R. 55 (Mem. Op. & Order) (Page ID #1489-98). The SSA filed a notice of appeal in the seven cases proceeding before Judge Thapar on February 21, 2017. E.g. , 16-cv-154 (Hicks), R. 57 (Notice of Appeal) (Page ID #1658-59). The remaining four plaintiffs obtained leave to appeal Judge Reeves's and Judge Hood's interlocutory orders granting partial summary judgment to the SSA on May 24, 2017. E.g., 16-cv-35 (Perkins), R. 70 (Order) (Page ID #1653-56). This appeal followed.
II. DISCUSSION
A. Due Process
Plaintiffs' due-process challenge focuses on the SSA's refusal to accord them an opportunity to rebut the OIG's assertion of fraud as to the Conn-related medical reports. Pls. Br. at 17. A preliminary question in this case is whether the three-factor balancing test laid out in Mathews v. Eldridge , 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), governs this due-process claim. As a plurality of the Supreme *797 Court explained in Hamdi v. Rumsfeld , 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004),
Mathews dictates that the process due in any given instance is determined by weighing "the private interest that will be affected by the official action" against the Government's asserted interest, "including the function involved" and the burdens the Government would face in providing greater process. The Mathews calculus then contemplates a judicious balancing of these concerns, through an analysis of "the risk of an erroneous deprivation" of the private interest if the process were reduced and the "probable value, if any, of additional or substitute procedural safeguards."
Id. at 529, 124 S.Ct. 2633 (quoting Mathews , 424 U.S. at 335, 96 S.Ct. 893 ).
Plaintiffs argue that this is "a case about the minimum protections of due process," and Mathews -which plaintiffs understand as a test "used to determine whether additional process (i.e., beyond the minimum) is required"-does not apply. Pls. Br. at 32. In particular, plaintiffs insist that "procedural due process" requires, at a minimum, "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," and this baseline procedural protection may not be "balanced away." Id. at 19 (quoting Hamdi , 542 U.S. at 533, 124 S.Ct. 2633 ). The SSA, in turn, insists that the Supreme Court and this court have long applied Mathews to assess whether the government has provided "the core due process protection of a meaningful hearing," SSA Reply Br. at 9, and that the district court in Hicks erred in delineating a "formal" test for the base requirements of procedural due process and a "functional" test for everything else, SSA Br. at 47-48. We conclude that plaintiffs have the better argument, and hold that the SSA's procedures violate long-standing principles of procedural due process that predate the Mathews test. Even under Mathews , however, plaintiffs would prevail.
1. Minimum Due-Process Analysis
Long before Mathews , the Supreme Court recognized the "immutable" principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Greene v. McElroy , 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Both in Mathews and subsequently, the Court has reaffirmed this basic tenet. See Mathews , 424 U.S. at 346, 96 S.Ct. 893 (holding that the SSA's process for terminating disability benefits satisfies constitutional due-process requirements because beneficiaries are able "to challenge directly the accuracy of information in [their] file[s] as well as the correctness of the agency's tentative conclusions"); see also Hamdi , 542 U.S. at 533, 124 S.Ct. 2633 (plurality) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."); id. at 553, 124 S.Ct. 2633 (Souter, J., joined by Ginsburg, J., concurring in relevant part) ("[S]omeone in [the defendant's] position is entitled at a minimum to notice of the Government's claimed factual basis for holding him, and to a fair chance to rebut it before a neutral decisionmaker."); Conn. Dep't of Pub. Safety v. Doe , 538 U.S. 1, 7, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003) ("[D]ue process require[s] the government to accord the plaintiff a hearing to prove or disprove a particular fact or set of facts .... [that are] relevant to the inquiry at hand."). As *798 the government's action in this case "depends on fact findings" that the plaintiffs have not been provided the opportunity to rebut, the government's process is constitutionally inadequate. See Greene , 360 U.S. at 496, 79 S.Ct. 1400.
The SSA argues, in effect, that the deprivation of plaintiffs' benefits in this case did not "depend on" the government's finding that the reports by Conn's doctors involved fraud, see id. , because it turned instead on the government's finding that the other evidence in the plaintiffs' records was insufficient to establish disability. SSA Br. at 44. An agency's determination, however, "depends on fact findings" beyond the ultimate factual question at issue, and due process protects a person's right to contest not only the final finding, but also the relevant preliminary findings. See Wisconsin v. Constantineau , 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) ("Only when the whole proceedings leading to the pinning of an unsavory label on a person are aired can oppressive results be prevented." (emphasis added) ); cf. United States v. Davis , 928 F.2d 405, 1991 WL 37829, at *4 (6th Cir. 1991) ("[D]ue process in sentencing demands that 'the defendant be given the opportunity to rebut factors that might enhance a sentence.' " (quoting United States v. Castellanos , 904 F.2d 1490, 1495 (11th Cir. 1990) ) ). The final factual decision is the product of preliminary factual findings. When a party is improperly handicapped in disputing a preliminary issue, the overall outcome is also tainted.
Moreover, in this consolidated appeal, the exclusion of the Conn-related medical reports is inextricably bound up with the denial of plaintiffs' benefits because, according to plaintiffs, they are now unable to provide sufficient substitute evidence of their initial eligibility for benefits. See Pls. Br. at 28-29. Perhaps plaintiffs would not have received a favorable outcome if their initial medical records were considered in the redetermination process, id. at 25-after all, the ALJ deciding the initial review was hardly neutral-but inclusion of these reports nevertheless constitutes plaintiffs' only hope of restoring their benefits, id. at 28-29. To preclude plaintiffs from contesting the fraudulent nature of the reports would be akin to allowing Hamdi (the plaintiff in Hamdi who had been held in Guantanamo as an "enemy combatant" solely on the say-so of a U.S. government memorandum) to contest that he was an "enemy combatant" but not that he was captured on the battlefield in Afghanistan. If the latter fact more-or-less decides the former, then due process requires that both remain up for debate. See Hamdi , 542 U.S. at 526, 124 S.Ct. 2633 (plurality) (holding that Hamdi cannot be deemed to have conceded that he was captured in a combat zone because he was not "permitted to speak for himself or even through counsel as to those circumstances" (citation omitted) ).
According to the SSA, "the potential value of the excluded report" is irrelevant because "the 'right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.' " SSA Br. at 45 (quoting United States v. Scheffer , 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) ). The SSA's reliance on Scheffer is misplaced. There, the Court determined that the military could exclude polygraph evidence from court-martial proceedings because such evidence lacked "sufficient scientific acceptability to be relevant." United States v. Scheffer , 523 U.S. 303, 307, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (citation omitted). Scheffer therefore concerned a blanket prohibition on certain forms of evidence; this case, by contrast, concerns a particularized determination that aspects of plaintiffs' records are tainted *799 by fraud-precisely the sort of adjudicative factual determination that requires a hearing to sort out. See Londoner v. City & Cty. of Denver , 210 U.S. 373, 385-86, 28 S.Ct. 708, 52 L.Ed. 1103 (1908). The dissent minimizes the way in which this particularized determination distinguishes our case from Scheffer , but it is meaningful. See Dissent at 822. With individualized determinations comes a risk of individualized evaluative error on the part of the SSA reviewer, the kind plaintiffs are entitled to dispute. No such risk of individualized error is posed by the blanket nature of the polygraph evidence prohibition in Scheffer .
Even if Scheffer were a relevant precedent, it offers no support for the SSA's contention that "the potential value of the excluded report" is irrelevant. Rather, Scheffer recognized that even generally applicable evidentiary rules may "raise a constitutional concern" if they "implicate a sufficiently weighty interest of the [plaintiff]." 523 U.S. at 309, 118 S.Ct. 1261. Thus, a state rule banning "all hypnotically refreshed testimony" must bend when a "defendant, accused of a killing to which she was the only eyewitness, was allegedly able to remember the facts of the killing only after having her memory hypnotically refreshed," as a contrary holding would "deprive[ ] the jury of the testimony of the only witness who was at the scene and had firsthand knowledge of the facts" and would "infringe[ ] upon the defendant's interest in testifying in her own defense." Id. at 315, 118 S.Ct. 1261 (discussing Rock v. Arkansas , 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) ). By the same token, refusing to allow plaintiffs here to present the only persuasive evidence of their earlier eligibility for disability benefits "implicate[s] a sufficiently weighty interest of the [plaintiffs] to raise a constitutional concern." Id. at 309, 118 S.Ct. 1261. The dissent fails to address possible constitutional limitations on evidentiary rules. See Dissent at 822. Of course, this does not mean that the SSA must allow plaintiffs to rely on fraudulent evidence in their redetermination hearings. But it does mean that the SSA must proffer some factual basis for believing that the plaintiffs' evidence is fraudulent, and the plaintiffs must have an opportunity to "rebut the Government's factual assertions before a neutral decisionmaker." See Hamdi , 542 U.S. at 533, 124 S.Ct. 2633.
2. Due-Process Analysis under Mathews
Applying the Mathews test leads to the same result. Mathews directs courts to weigh the private interest in a property right against the government's interest in avoiding additional or substitute process, in light of "the risk of an erroneous deprivation" of a property holder's interest "and the probable value, if any, of additional or substitute procedural safeguards." Mathews , 424 U.S. at 335, 96 S.Ct. 893. Mathews' s balancing, however, is not suspended in space; it operates against a constitutional bottom. As the D.C. Circuit once put it,
[d]epending upon the tilt of the Mathews balance in a particular case, ... the timing and content of the [required] hearing may vary. Nevertheless, however weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero-that is, the government is never relieved of its duty to provide some notice and some opportunity to be heard prior to final deprivation of a property interest.
Propert v. District of Columbia , 948 F.2d 1327, 1332 (D.C. Cir. 1991) (internal citations omitted). We therefore see Mathews less as a three-way see-saw, and more as a two-step template.
*800 First, courts must consider when, in Mathews 's parlance, the "risk of an erroneous deprivation" is too high. At some foundational level, this factor is dispositive. After all, "some form of hearing is required before an individual is finally deprived of a property interest," Mathews , 424 U.S. at 333, 96 S.Ct. 893 (emphasis added), no matter how small the interest or how great the governmental burden. Next, after establishing the base level of process owed, courts must weigh the remaining factors to determine how much more ought to be provided. Where the liberty or property interest is significant and the cost to the government of providing additional, valuable process is low, then greater procedures must be implemented. Where the liberty or property interest is relatively low, the value of additional procedures is minimal, and the cost to the government is high, then nothing more is necessary.
This is essentially how a plurality of the Supreme Court approached the Mathews test in Hamdi . The plurality first noted the strong interests at stake both for Hamdi and the government, Hamdi , 542 U.S. at 529-32, 124 S.Ct. 2633, concluded that the "risk of an erroneous deprivation" became intolerable if Hamdi was deprived of "notice of the factual basis for his classification [as an enemy combatant] and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," id. at 533, 124 S.Ct. 2633, and then considered what additional procedures, beyond the "core elements" already identified, would be necessary to protect Hamdi's interest, in light of the significance of Hamdi's interest, the probable value of additional safeguards, and the national security risks associated with implementing them, id. at 533-35, 124 S.Ct. 2633. Ultimately, the plurality determined that little more than the constitutional minimum was necessary. Id. The evidentiary standards and burdens associated with criminal trials, while presumably valuable in avoiding erroneous deprivations of liberty, were not worth the national security cost. Id. at 533-34, 124 S.Ct. 2633. The Hamdi plurality decision therefore guides courts on both the proper application of Mathews and the base level of protection it must provide-i.e., "notice of the factual basis" for a governmental determination and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." Id. at 533, 124 S.Ct. 2633.
Applying Mathews here, we conclude that the risk of an erroneous deprivation under the SSA's current framework is too high. The SSA argues that the current process leaves little room for error, as plaintiffs may rely on a host of other evidence beyond the Conn-related medical reports, including evidence that was not submitted in the initial determination, and the Conn-related reports would, in any event, be a low-weighted factor in the ALJ's analysis. SSA Br. at 35-43. But Supreme Court precedent, including precedent applying Mathews , indicates that any time a citizen is deprived of "notice of the factual basis" for a governmental determination and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," the risk of error is too high. Hamdi , 542 U.S. at 533, 124 S.Ct. 2633 ; see also Wilkinson v. Austin , 545 U.S. 209, 225-26, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (holding that Ohio's process for assigning prisoners to maximum-security prisons was constitutional because the state gave inmates "notice of the factual basis leading to consideration for [maximum-security-prison] placement and a fair opportunity for rebuttal," and Supreme Court case law "ha[s] consistently observed that these [protections] are among the most important procedural *801 mechanisms for purposes of avoiding erroneous deprivations").
Moreover, even if the risk of an erroneous deprivation were not intolerably high whenever claimants are precluded from rebutting material factual assertions about their case, the risk of an erroneous deprivation is nevertheless too high in these cases. Even assuming fraud could be reliably detected through a blanket rule-a point the Supreme Court has previously called into doubt, see Califano v. Yamasaki , 442 U.S. 682, 697, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("We do not see how [social security beneficiaries' "fault" or "good faith"] can be evaluated absent personal contact between the recipient and the person who decides his case.")-the SSA's exclusionary rule is over-expansive. The OIG referral stated only that the OIG had reason to believe that a small portion of the four physicians' reports-the RFC forms-had been fraudulently prepared, 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146), yet the SSA disregarded any evidence signed by Adkins, Ammisetty, Huffnagle, or Herr and submitted by the Conn Law Firm between January 2007 and May 2011, e.g. , 16-cv-154 (Hicks), R. 20-4 (Notice of Appeals Council Action at 2) (Page ID #340). The SSA's rule therefore excludes a wide range of materials that the OIG never claimed to have "a reason to believe" were tainted by fraud.
The divergence between the material identified by the OIG and the material excluded by the SSA highlights the danger of the SSA's approach. Not only are the OIG's assertions of fraud unreviewable, but the SSA's application of those assertions is unreviewable. Currently, the SSA asserts that it has "reason to believe" that all reports signed by Adkins, Ammisetty, Huffnagle, and Herr and submitted by Conn between January 2007 and May 2011 contained fraud. But what if the SSA instead declared that all reports signed by the four doctors-regardless of whether they were submitted by Conn-were tainted by fraud? What would preclude the SSA from interpreting the OIG's referral this broadly? In effect, the SSA insists that it may unilaterally select the criteria for fraud (based on vague statutory guidance) and then unilaterally select which evidence satisfies those criteria. With no adversarial input and no judicial oversight, the risk that nonfraudulent material will be erroneously excluded is impermissibly high.[3]
The dissent essentially argues that the "reason to believe" standard is "nearly irrebuttable," and therefore due process affords plaintiffs no entitlement to attempt to rebut it. See Dissent at 821-22. We see things differently. The considerable liberties that the SSA has taken in interpreting and administering the "reason to believe" standard advocate in favor of a procedural check, not against it. In extolling the virtues of the non-adversarial "reason to believe" determination, the dissent draws an analogy to the Supreme Court's approval of a non-adversarial probable cause determination in criminal cases. See Dissent at 820-21 (discussing Kaley v. United States , 571 U.S. 320, 338-39, 134 S.Ct. 1090, 188 L.Ed.2d 46 (2014) ). Yet in criminal cases the same question underlies the initial probable cause determination and the ultimate issue at trial: whether the defendant committed the crime. Here, however, the question of whether there is "reason to *802 believe" that materials were tainted by fraud is distinct from the later question of eligibility for benefits. Once the SSA has determined that there is "reason to believe" a possible fraud occurred, access to a class of evidence is forever foreclosed to a beneficiary in his subsequent redetermination hearing. No such negative consequence follows from a non-adversarial finding of probable cause in criminal cases because it "determines only whether adequate grounds exist to proceed to trial and reach that [same] question." Kaley , 571 U.S. at 399, 134 S.Ct. 1090.
The SSA nevertheless argues that it does not matter much whether nonfraudulent material is wrongly disregarded because the likelihood of a wrongful benefit determination remains low. SSA Br. 38-41. In support, the SSA notes that plaintiffs may submit new evidence showing the same facts as the excluded reports. Id. at 38-39. But plaintiffs persuasively argue that this procedural protection may be of little practical value for most claimants affected by Conn's scheme. Conn failed to turn in claimants' medical files once their cases were assigned to Daugherty and then seemingly destroyed a great deal of the files when news of his misconduct began to break, Senate Report at 122; 16-cv-154 (Hicks), R. 22-1 (Slone Aff. ¶ 3) (Page ID #1082), and it is understandably difficult to obtain new evidence of past disability. The SSA notes that plaintiffs did, for the most part, supplement their files with new evidence during the redetermination process. SSA Br. at 39. But simply because they fought on with whatever means remained available does not imply that they were not disadvantaged by their inability to contest the SSA's denial of their use of the reports. For similar reasons, the SSA's claim, which the dissent wholeheartedly embraces, see Dissent at 819-20, 821-22, that the excluded medical reports are relatively insignificant because they were never supposed to receive controlling weight in the benefits determination also fails, see SSA Br. at 39-41. Even if the excluded reports would generally not override contrary evidence from treating physicians, see 20 C.F.R. § 404.1527(c)(2), they could nevertheless corroborate other evidence in the file and potentially tip the scales toward a favorable determination.
The remaining two Mathews factors also favor plaintiffs. The Supreme Court has long recognized that social security disability beneficiaries have a substantial interest in receiving their benefits, as "the hardship imposed upon the erroneously terminated disability recipient may be significant." Mathews , 424 U.S. at 342, 96 S.Ct. 893. Here, plaintiffs provide some evidence as to precisely how significant the hardship is: upon losing her benefits, Hicks moved into a camper without a bathroom and signed up for food stamps, and her depression worsened. 16-cv-154 (Hicks), R. 49-1 (Hicks Aff. ¶¶ 2, 4, 6) (Page ID #1629-30). In addition, upon termination of their benefits, plaintiffs became liable for significant overpayment liabilities. See id. ¶ 7 (Page ID #1630) (noting Hicks received a letter from the SSA saying that she owes $62,000 in overpayment). SSA contends that plaintiffs could mitigate the hardship associated with losing their benefits by (1) applying for new benefits, and (2) applying for a waiver of overpayment. SSA Br. at 30-31. But, as the district court in Hicks noted, "filing an entirely new application or defending past payments is itself a burden," 16-cv-154 (Hicks), R. 36 (Mem. Op. & Order at 24) (Page ID #1351), and three of the plaintiffs' applications for new benefits have already been denied, SSA Reply Br. at 13 n.6. With respect to waivers, the SSA has declined to provide blanket overpayment amnesty to plaintiffs or other Conn clients, which renders the threat of overpayment *803 penalties a distinct and troubling possibility for most plaintiffs. Pls. Br. at 41. (The SSA has approved waiver requests for four plaintiffs, and one plaintiff's overpayment penalty was discharged in bankruptcy. SSA Reply Br. at 13 n.6.) Further, there is a distinct dignitary harm to beneficiaries who are not allowed to effectively dispute the allegation that they have been receiving undeserved benefits for close to ten years, leeching government resources to which they had no right. This harm remains even if overpayment is waived. The dissent trivializes all of the above hardships, see Dissent at 816-17, contributing to its skewed Mathews balancing.
As to the government's interest in avoiding additional procedures, the SSA's position boils down to arguments about cost and administrative burden. The SSA believes plaintiffs' requested procedure would require an ALJ to hold a hearing in which an OIG agent would "testif[y] about how he came to believe that here was fraud in part of [the plaintiffs'] file[s]," and the plaintiffs would "cross-examine[ ] the agent and present[ ] evidence to show why [their medical reports] were all true." SSA Br. at 33 (quoting 16-cv-154 (Hicks), R. 36 (Mem. Op. & Order at 29) (Page ID #1356) ). The SSA contends that such a process would be "extraordinarily burdensome" and would "infringe on law enforcement efforts concerning the fraud scheme" because it would require ALJs to review the sufficiency and merits of the OIG's investigatory efforts. SSA Br. at 33-34. The SSA further argues that additional procedures would frustrate Congress's efforts to ensure that redeterminations occur quickly, as evidenced by the requirement that SSA "immediately redetermine" benefits upon developing a "reason to believe" that fraud was involved in the initial application. Id. at 35 (citing 42 U.S.C. § 405(u) ).
These arguments are not compelling. We are particularly unpersuaded by the SSA's timing claims, given that the SSA waited nearly ten years after first learning about possible misconduct involving Conn and Daugherty to initiate redetermination proceedings. It seems disingenuous now to claim that plaintiffs should receive fewer procedural protections because the SSA is statutorily obligated to move quickly. Nor do we believe that "forcing OIG investigators to testify in over 1,500 redetermination hearings" would be particularly onerous given that SSA investigators would have to do the same thing if they developed a "reason to believe" fraud existed in 1,500 applications for benefits. See SSA Reply Br. at 18; 42 U.S.C. § 405(u). If anything, the burden might be greater on the SSA investigators, as it is more likely that whatever fraud they uncover involves a single beneficiary, see SSA Reply Br. at 40, and therefore they would not benefit from the economies of scale that might exist in redeterminations spawned from OIG investigations. The dissent attacks a straw man of "complex evidentiary hearings into wide-ranging fraud schemes" in which "officials [ ] spend inordinate time testifying over and over again about that Inspector General's investigation into the Conn fraud." Dissent at 817. Yet if the application of the "reason to believe" standard is as formulaic as the dissent elsewhere claims, there is no reason such extensive testimony would be required. And although we do hold that the current state of affairs fails to afford beneficiaries due process, we have not mandated the particular ameliorative procedures that the SSA and dissent assume and bemoan. This district court, for example, proposed a considerably less painful adversarial procedure than the travails described by the dissent. See 16-cv-154, R. 36 (Mem. Op. and Order at 29) (Page ID #1356). Finally, if the SSA
*804 is concerned about interfering with ongoing law enforcement efforts, the SSA may secure a certification, in writing, from a state or federal prosecutor with jurisdiction over the investigations saying that the redeterminations would "jeopardize the criminal prosecution of a person involved in a suspected fraud," and the redetermination proceedings would halt. 42 U.S.C. § 405(u)(1)(A). Congress has already told the SSA what to do when redetermination proceedings threaten criminal adjudications, and the answer is not to deprive claimants of basic procedural safeguards.
At bottom, the district court in Hicks was right to conclude that refusing to allow plaintiffs to rebut the OIG's assertion of fraud as to their individual applications violates the Due Process Clause of the Fifth Amendment. We therefore AFFIRM the grant of partial summary judgment to plaintiffs in Hicks and REVERSE the partial grant of summary judgment to the SSA in Carter and Perkins .
B. Administrative Procedure Act ("APA")
Plaintiffs argue that the SSA violated the APA by (1) failing to comply with the APA's requirements concerning formal adjudications and (2) acting in an arbitrary and capricious manner by allowing claimants whose benefit determinations are suspected of fraud by the SSA to rebut assertions of fraud, but denying the same procedural protection to claimants whose benefit-determinations are suspected of fraud by the OIG. The district courts in Perkins and Carter rejected these arguments and entered partial summary judgment in the SSA's favor on plaintiffs' APA claims. We now REVERSE .
1. Failure to Comply with the Administrative Procedure Act's Formal-Adjudication Requirements
The APA distinguishes between formal adjudications, which must follow a set of "trial-type procedures," including "notice of 'the matters of fact and law asserted,' an opportunity for 'the submission and consideration of facts [and] arguments,' and an opportunity to submit 'proposed findings and conclusions' or 'exceptions,' " and informal adjudications, which "do not include such elements." Pension Ben. Guar. Corp. v. LTV Corp. , 496 U.S. 633, 655, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (internal citations omitted) (alteration in original). Section 405(b)(1) of the Social Security Act directs the SSA to make "findings of fact" and "decisions as to the rights of any individual applying" for Social Security payments. 42 U.S.C. § 405(b)(1). The parties appear to agree that all proceedings under 42 U.S.C. § 405(b)(1) are subject to the APA's formal-adjudication requirements, Pls. Br. at 54-55; SSA Reply Br. at 36-a point we have previously established, see Calvin v. Chater , 73 F.3d 87, 91 (6th Cir. 1996) ; Mullen v. Bowen , 800 F.2d 535, 536 n.1 (6th Cir. 1986) (en banc).[4] The parties also seem to agree that a redetermination proceeding, which is governed by 42 U.S.C. § 405(u), is a proceeding under 42 U.S.C. § 405(b)(1).[5]
*805 Pls. Reply Br. at 3; SSA Reply Br. at 36-37. The parties then part ways on two points. First, plaintiffs contend that the redetermination hearings, which were required to comply with the APA's requirements for formal adjudications, did not in fact do so. The SSA, in turn, argues that the redetermination hearings necessarily complied with the APA's formal-adjudication requirements because they conformed to 42 U.S.C. § 405(b)(1), and the requirements of § 405(b)(1) and the APA's formal-adjudication provisions are coterminous. SSA Reply Br. at 36-37. Second, the SSA insists that plaintiffs' actual challenge is that "they did not receive a hearing on OIG's reason to believe that fraud was involved in the applications for benefits," and plaintiffs' claim therefore must fail because the OIG's fraud determination is not governed by 42 U.S.C. § 405(b) and therefore need not conform to the APA requirements for formal adjudications. Id. at 37-38.
The SSA's first argument is somewhat hard to follow. If, as the SSA argues, "the protections provided by § 405(b)(1) are co-extensive with the APA's provisions on formal adjudication," SSA Reply Br. at 37, then the SSA's failure to comply with one act amounts to a violation of the other.[6] And here, plaintiffs have identified at least one way in which the SSA's procedures failed to comply with the APA's formal-adjudication requirements. In particular, the APA provides that "[w]hen an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary." 5 U.S.C. § 556(e). This circuit has considered the meaning of § 556(e) in only two cases, both concerning an ALJ's failure to provide "official notice" and an "opportunity to show the contrary" before taking notice of materials outside the record. See id. ; Dixie Fuel Co., LLC v. Dir., Office of Workers' Comp. Programs , 820 F.3d 833, 846 (6th Cir. 2016) ; Baker v. Dir., Office of Workers' Comp. Programs , 980 F.2d 729, 1992 WL 361287, at *2 (6th Cir. 1992) (order) ). Both cases noted that the ALJ's failure to comply with § 556 would require reversal of the ALJ's determination and remand for further fact-finding unless the error was harmless. Dixie , 820 F.3d at 846 ; Baker , 1992 WL 361287, at *2. As is most relevant here, we held in Baker that the ALJ's error was not harmless because the ALJ "essentially rejected the only remaining medical opinion that could have established [the plaintiff's claim]" based, in part, on his assessment of the drafting physician's qualifications, which were not included in the record.
*806 Baker , 1992 WL 361287, at *2. Similarly, here, plaintiffs have provided evidence demonstrating that the ALJs assigned to plaintiffs' redetermination hearings essentially rejected the only remaining medical opinions that could have established plaintiffs' claims based on the OIG's off-the-record determination that the records involved fraud-determinations plaintiffs had no opportunity to rebut or contest. The SSA's process therefore fails under the APA.[7]
The SSA's second argument-that plaintiffs are actually contesting the OIG's fraud-determination process rather than the benefits-redetermination hearing, SSA Reply Br. at 37-38-fares no better. Plainly, plaintiffs' suit concerns the level of process they were accorded by the SSA in their redetermination hearings, not at the OIG-referral stage. The SSA cannot reframe plaintiffs' complaint to evade responsibility for failing to abide by the APA's requirements. The district courts in Perkins and Carter therefore erred in granting summary judgment to the SSA on plaintiffs' claims that the SSA's redetermination process violated the APA's formal-adjudication requirements
2. Disparate Treatment of Fraud Allegations Based on Originating Source
According to plaintiffs, the SSA also violated the APA's prohibition on "arbitrary" or "capricious" decisionmaking, see 5 U.S.C. § 706(2)(A), by adopting different procedures for claimants whose initial-benefits determinations are suspected of fraud by the SSA as opposed to those suspected of fraud by the OIG.[8] Pls. Br. at 57. The SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX") contemplates three ways in which the SSA could develop a "reason to believe" that fraud *807 was involved in a given application.[9] First, "[a]n SSA investigation [could] result[ ] in a finding of fraud or similar fault." HALLEX I-1-3-25(C)(4)(a). Second, the SSA could receive "[a] referral based on information obtained during a criminal or other law enforcement investigation." Id. And third, the OIG-an investigatory division of the Social Security Administration-could refer information to the Commissioner of Social Security. Id. ; ABOUT THE OIG, https://oig.ssa.gov/about-oig (last visited Aug. 3, 2018). HALLEX directs ALJs conducting redetermination hearings to adopt different procedures depending on which of the above three sources triggered the redetermination. When the SSA alone suspects that a claimant's determination was tainted by fraud, "an adjudicator can consider a beneficiary's or recipient's objection to the disregarding of certain evidence." HALLEX I-1-3-25(C)(4)(a). "[I]f the adjudicator disregards the evidence because a preponderance of the evidence shows that fraud or similar fault was involved in providing the evidence, he or she will address the beneficiary's or recipient's objection in his or her decision." Id. If, by contrast, the redetermination is "based on an OIG referral of information or a referral based on information obtained during a criminal or other law enforcement investigation," then "adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded." Id. Plaintiffs allege that granting additional procedures to a subset of claimants based on which agency first suspects fraud is arbitrary and capricious, particularly where, as here, the SSA may actually suspect fraud first but transfer the investigation to the OIG rather than handling the matter itself. Pls. Br. at 58-59.
In response, the SSA argues that it makes sense to treat OIG-based determinations of fraud differently than SSA-based determinations of fraud because adopting plaintiffs' proposed procedure would (1) be unduly burdensome on "both the law enforcement agency and SSA's ALJ corps," as the OIG is more likely than the SSA to conduct large-scale investigations, and therefore more beneficiaries are affected by OIG-based determinations of fraud than SSA-based determinations; (2) "risk interference with the investigation and resulting criminal prosecution"; and (3) "place the ALJs in the untenable position of reviewing the sufficiency of law enforcement efforts." SSA Reply Br. at 40.[10]
*808 Plainly, the SSA did not include any of the reasons it now offers for treating OIG-based determinations of fraud differently than SSA-based determinations of fraud in HALLEX. "[A]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself," Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), and not based on "appellate counsel's post hoc rationalization[s]," Comcast Cablevision-Taylor v. NLRB , 232 F.3d 490, 497 (6th Cir. 2000) (quoting Flav-O-Rich, Inc. v. N.L.R.B. , 531 F.2d 358, 362 (6th Cir. 1976) ). Although State Farm 's ban on post-hoc rationalizations was issued in the context of notice-and-comment rulemaking, the Supreme Court has since made clear that an agency must "articulate a satisfactory explanation for its action" in other circumstances, as well. See FCC v. Fox Television Stations, Inc. , 556 U.S. 502, 513, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (quoting State Farm , 463 U.S. at 43, 103 S.Ct. 2856 ) (assessing whether the Federal Communication Commission's reasons behind announcing a "new enforcement policy" and "expanding the scope of its enforcement activity" were "rational," id. at 517, 129 S.Ct. 1800 ); see also Perez v. Mortg. Bankers Ass'n , --- U.S. ----, 135 S.Ct. 1199, 1209, 191 L.Ed.2d 186 (2015) (noting that the arbitrary-and-capricious standard "requires an agency to provide more substantial justification" when it announces a new interpretive rule based on "factual findings that contradict those which underlay its prior policy" (second quote quoting Fox Television Stations , 556 U.S. at 515, 129 S.Ct. 1800 ) ).
In any event, even if we were to credit the SSA's post-hoc explanations for distinguishing between OIG- and SSA-based determinations of fraud, its purported justifications are insufficient. All of the SSA's rationales for distinguishing between claimants whose files were deemed fraudulent by the OIG and claimants whose files were deemed fraudulent by SSA turn on differences between the OIG and the SSA-not between the claimants. The SSA has not provided any citations to suggest agencies can distinguish between similarly situated claimants based on circumstances entirely outside their control, and there is good reason to believe such action violates the APA. In Miller v. Bond , 641 F.2d 997 (D.C. Cir. 1981), the D.C. Circuit held that the Federal Aviation Administration's ("FAA") sick-leave policy was arbitrary and capricious because the FAA considered not only whether an employee had complied with the written requirements for obtaining sick leave (i.e., submitting a doctor's note), but also whether the employee had provided evidence of "objective symptoms." Id. at 1005. The FAA did not notify employees that submitting evidence of "objective symptoms" was necessary for, "or even particularly helpful to, gaining approval of their sick leave requests." Id. As a result, "whether a particular employee happened to submit the evidence deemed necessary to qualify for that category became *809 a matter of sheer luck." Id. "Decisions based on luck," the D.C. Circuit held, "can only be described as 'arbitrary and capricious,' and therefore invalid." Id. The same logic applies here: plaintiffs are not accused of willingly participating in Conn's scheme, such that they could perhaps be deemed responsible for the procedural consequences of triggering an OIG investigation. Instead, they had the misfortune of hiring an attorney whose misconduct was widespread enough to warrant an OIG, as opposed to an SSA, investigation. Procedurally penalizing plaintiffs on this basis is arbitrary and capricious.
We therefore REVERSE the district courts' grant of summary judgment in the Perkins and Carter cases to the SSA on plaintiffs' claims under the APA and REMAND for further proceedings consistent with this opinion.
C. Social Security Act
Plaintiffs allege two violations of the Social Security Act ("the Act"). First, they allege that the SSA violated the Act by redetermining plaintiffs' benefits without first proving that their initial determinations involved fraud, in violation of the SSA's procedures governing reopenings and common-law and statutory principles of res judicata. Second, plaintiffs argue that the SSA violated the Act by failing "immediately" to redetermine plaintiffs' entitlement to benefits, as required under 42 U.S.C. § 405(u). On these claims, we affirm the district courts' determinations in Carter and Perkins to grant summary judgment to the SSA.
1. Reopenings and Res Judicata
Turning first to plaintiffs' "reopening" argument: SSA regulations authorize the SSA to "reopen" a determination of benefits if "[i]t was obtained by fraud or similar fault." 20 C.F.R. § 404.988(c)(1). The Program Operations Manual System ("POMS") (an internal instruction manual) explains that the SSA will not reopen initial determinations unless there is "a preponderance of evidence to prove the existence of fraud." POMS § GN 04020.010(B)(2). The manual continues, "we should not think, suppose, suspect, or speculate that fraud or similar fault exists; we should be able to prove it." Id. § GN04020.010(D)(1). If, as plaintiffs allege, redeterminations must follow the same procedural requirements as reopenings, then the SSA erred by redetermining plaintiffs' entitlement to benefits based solely on the OIG's conclusion that there was "reason to believe" that fraud was involved in plaintiffs' applications, without establishing proof of fraud by a preponderance of the evidence.
This claim is a nonstarter, as plaintiffs cannot establish that the procedures governing reopenings also govern redeterminations. Title 42 U.S.C. § 405(u)(1)(A) directs SSA to "redetermine" entitlement to benefits whenever "there is reason to believe that fraud ... was involved in the application" for benefits. On its face, then, § 405(u) requires the SSA to redetermine benefits based on something less than proof of fraud. Deutsche Bank Nat. Tr. Co. v. Tucker , 621 F.3d 460, 463 (6th Cir. 2010) ("If the statutory language is unambiguous, 'the judicial inquiry is at an end, and the plain meaning of the text must be enforced.' " (quoting United States v. Plavcak , 411 F.3d 655, 661 (6th Cir. 2005) ). Moreover, the SSA has issued a Social Security Ruling explaining that "[f]raud and similar fault determinations under [ 42 U.S.C. § 405(u) ] ... are distinct from reopenings as described in 20 CFR 404.987 - 404.996 and 20 CFR 416.1487 - 416.1494." Social Security Ruling 16-1p, 81 Fed. Reg. 13,436, 13,436 n.1 (Mar. 14, 2016). As an interpretation of *810 the reopening regulations, the Social Security Ruling is entitled to Auer deference.[11] Wilson v. Comm'r of Soc. Sec. , 378 F.3d 541, 549 (6th Cir. 2004) (holding that a Social Security Ruling, as "an agency's interpretation of its own regulation[,] is entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation") (citing Auer v. Robbins , 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ).[12]
Plaintiffs' broader res-judicata argument fails for similar reasons. As plaintiffs note, common-law principles of res judicata generally preclude agencies from readjudicating prior determinations. Drummond v. Comm'r of Soc. Sec. , 126 F.3d 837, 842 (6th Cir. 1997). Though plaintiffs concede that agencies may reassess prior determinations tainted by fraud, they argue that agencies must first " 'prove the allegations' of fraud." Pls. Br. at 61 (citing Restatement (Second) of Judgments § 70(2)(b) ). Plaintiffs contend that this common-law principle of res judicata was codified by the Social Security Act in 42 U.S.C. § 405(h), which provides that "[t]he findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing," id. , and incorporated into the SSA's regulations on reopenings. Pls. Br. at 61-62. According to plaintiffs, when Congress enacted § 405(u), it meant to incorporate these preexisting principles of res judicata into the redetermination process. Id.
The SSA concedes that res judicata principles apply in the agency setting, but it argues that courts may not "impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand. In this context, the question is not whether administrative estoppel is wise but whether it is intended by the legislature." SSA Reply Br. at 44 (quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino , 501 U.S. 104, 108, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ). According to the SSA, Congress manifested an intent to override background principles of res judicata when it enacted § 405(u). Id. We agree. "[C]ourts may take it as given that Congress has legislated with an expectation that the principle [of res judicata] will apply except 'when a statutory purpose to the contrary is evident.' " Solimino , 501 U.S. at 108, 111 S.Ct. 2166 (quoting Isbrandtsen Co. v. Johnson , 343 U.S. 779, 783, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952) ). "This interpretative presumption is not, *811 however, one that entails a requirement of clear statement, to the effect that Congress must state precisely any intention to overcome the presumption's application to a given statutory scheme." Id. Here, Congress plainly intended to authorize reassessments of initial determinations without proof of fraud when it directed the SSA to "redetermine the entitlement of individuals ... if there is reason to believe that fraud ... was involved in the application [for benefits]." 42 U.S.C. § 405(u)(1)(A) (emphasis added). Nothing in the legislative history can override this textual mandate. See Deutsche Bank Nat. Tr. Co. , 621 F.3d at 463. The district courts in Perkins and Carter therefore properly granted the SSA summary judgment on this claim.
2. Failure to Act Immediately
In their final claim, plaintiffs argue that the SSA violated the Act by failing to "immediately redetermine" plaintiffs' entitlements to benefits, as required under 42 U.S.C. § 405(u)(1)(A). Plaintiffs contend that the SSA had "reason to believe that fraud ... was involved in the application[s]" for benefits as far back as 2006, when whistleblowers first disclosed Conn's scheme, and yet failed to begin the redetermination process until 2015. Pls. Br. at 15.
In response, the SSA contends that it complied with § 405(u), as it issued notices to plaintiffs regarding their redetermination hearings within a week of receiving a letter from the OIG stating there were no "objections to SSA moving forward with its administrative processing of the redeterminations" of the applications implicated in Conn's scheme. 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146); SSA Reply Br. at 45-46. As plaintiffs rightly note, however, nothing in § 405(u) permits the SSA to delay redetermination proceedings until it receives a green light from the OIG. Pls. Reply Br. at 23-24. Section 405(u) directs the SSA to "immediately redetermine" benefits when "there is reason to believe that fraud or similar fault was involved in the application." 42 U.S.C. § 405(u)(1)(A). The SSA had "reason to believe" plaintiffs' applications involved fraud as far back as 2006, when the SSA whistleblowers began raising alarms, and certainly by 2013, when the U.S. Senate issued a 166-page report detailing Conn's and Daugherty's abuses. See Senate Report at 4-8. If the SSA believed that they could not proceed with redetermination hearings until the OIG and criminal law-enforcement agents completed their investigations, it should have obtained a certification in writing from a state or federal prosecutor involved in the investigations. 42 U.S.C. § 405(u)(1)(A). The SSA failed to do so, and therefore failed to satisfy its statutory obligations under § 405(u).
Nevertheless, the SSA prevails on this claim. In United States v. Montalvo-Murillo , 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990), the Supreme Court refused to hold that a detainee must be released if the government fails "immediately" to hold a bail hearing "upon the [detainee's] first appearance before the judicial officer," as required under 18 U.S.C. § 3142(f). Id. at 714, 110 S.Ct. 2072 (citation omitted). As the Supreme Court explained,
[a] prompt hearing is necessary, and the time limitations of the Act must be followed with care and precision. But the Act is silent on the issue of a remedy for violations of its time limits. Neither the timing requirements nor any other part of the Act can be read to require, or even suggest, that a timing error must result in release of a person who should otherwise be detained.
Id. at 716-17, 110 S.Ct. 2072. The Supreme Court has since reiterated its position that *812 "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." United States v. James Daniel Good Real Prop. , 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).
Plaintiffs identify two exceptions to this general principle. First, they note that courts will enforce statutory timing requirements where the requirement is a "condition precedent" to authorizing agency action. Pls. Reply Br. at 26. The Supreme Court, however, has recently construed a statute with similar mandatory language as § 405(u) as not containing a condition precedent. See State Farm Fire & Cas. Co. v. United States ex rel. Rigsby , --- U.S. ----, 137 S.Ct. 436, 440, 443, 196 L.Ed.2d 340 (2016) (complaint under the False Claims Act need not be dismissed even if relator failed to abide by requirements that "[t]he complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." (emphasis added) ).
Plaintiffs argue that § 405(u) is "functionally identical to statutes in which the Supreme Court has held a condition precedent to be mandatory," Pls. Reply Br. at 26, but the sole case plaintiffs cite in support of this proposition- Hallstrom v. Tillamook Cty. , 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) -is readily distinguishable. Hallstrom concerned 42 U.S.C. § 6972(b)(1), which provides that "[n]o action may be commenced under [a subsection of the statute] ... (1) prior to sixty days after the plaintiff has given notice of the violation (A) to the Administrator [of the EPA]; (B) to the State in which the alleged violation occurs; and (C) to any alleged violator of such permit, standard, regulation, condition, requirement, or order ...." Id. at 25, 110 S.Ct. 304 (third alteration in original). As the Hallstrom Court explained, the language of § 6972(b)(1)"could not be clearer"; it expressly "prohibited" actions "commenced prior to 60 days after notice." Id. at 26, 110 S.Ct. 304. In such circumstances, allowing a plaintiff to file a suit within sixty days of satisfying the statute's notice requirements would be contrary to the statute's plain text. Here, by contrast, § 405(u) says nothing about what the SSA or courts should do if the SSA fails to "immediately" initiate redetermination proceedings. The clear statutory mandate evident in Hallstrom is therefore absent here.
Second, plaintiffs argue that an agency's failure to comply with a statutory timing requirement may preclude later action "if individuals are 'injuriously affected' by the procedural violation." Pls. Br. at 66 (quoting French v. Edwards , 80 U.S. 13 Wall. 506, 510, 20 L.Ed. 702 (1871) ). The Supreme Court has held since French that "nonconstitutional error will be harmless unless the court concludes from the record as a whole that the error may have had a 'substantial influence' on the outcome of the proceeding." Montalvo-Murillo , 495 U.S. at 722, 110 S.Ct. 2072. Plaintiffs insist that the SSA's failure to act immediately caused them significant harm, and they are likely right. The SSA's delay made it harder for plaintiffs to supplement their administrative records with additional relevant materials and enabled Conn to destroy records. These harms may have had a "substantial influence" on plaintiffs' ability to establish their initial eligibility for benefits long after the initial determination hearings.
However, the Supreme Court has also cautioned courts to consider "the general purpose" of statutes before imposing sanctions that "would undermine the very governmental interests that [the statute] is *813 meant to protect." Rigsby , 137 S.Ct. at 443 (citation omitted). As plaintiffs detail extensively in their briefs, "the general purpose" of § 405(u) was to enable the SSA to end fraudulent determinations more quickly than the reopening procedures at that time allowed. See Pls. Reply at 20. It thus seems counterintuitive to hold that a failure to reverse fraudulent determinations quickly enough precludes the government from reversing those determinations at all. Cf. Montalvo-Murillo , 495 U.S. at 718, 110 S.Ct. 2072 ("In our view, construction of the Act must conform to the 'great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.' " (quoting Brock v. Pierce Cty. , 476 U.S. 253, 260, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) ) ). Though plaintiffs may have been prejudiced by the SSA's delays, "[r]emedial tools" are likely available other than precluding the government from holding redetermination hearings, see Rigsby , 137 S.Ct. at 444 -such as, for instance, requiring the government to implement greater procedural protections. We therefore agree with the district courts in Perkins and Carter that summary judgment in the SSA's favor was appropriate as to this final claim.
III. CONCLUSION
The Due Process Clause of the Constitution and the Administrative Procedure Act required the SSA to allow plaintiffs an opportunity to show why the medical reports uniformly and entirely disregarded in their redetermination proceedings were not, in fact, tainted by fraud. Because the district courts in the Perkins and Carter cases reached the opposite conclusion, we REVERSE and REMAND those cases, in part, for further proceedings consistent with this opinion. Because we agree with the district court's resolution of the Due Process claims in the Hicks line of cases, and because we agree with the district courts' resolutions of the Social Security Act claims in the Perkins and Carter cases, we AFFIRM the district courts' judgments as to those issues.
DISSENT

The SSA now alleges, based on a statement attached to the plea agreement that Conn recently signed in his criminal prosecution, that Conn's "fabrication of evidence was not limited to RFC forms." SSA Br. at 13. According to Conn's plea agreement, Adkins also exaggerated the length of his evaluations and estimated claimants' IQs rather than administering proper IQ tests. 17-cr-43, R. 9-1 (Factual Basis Statement ¶ 7) (Page ID #36). The OIG did not mention (and perhaps did not know about) these non-RFC examples of fraudulent behavior in its letter referring plaintiffs' cases to the SSA for redetermination. 16-cv-154 (Hicks), R. 10-1 (OIG Letter) (Page ID #146).

The plaintiffs in Carter also alleged that the SSA's redeterminations were not supported by substantial evidence. That claim was not the subject of the SSA's motions for summary judgment. E.g. , 16-cv-101 (Griffith), R. 43 (Mem. Op. & Order at 14) (Page ID #963).

This is not to say that a rule excluding only the RFC forms would satisfy due process. For reasons laid out above, such a rule would still deprive plaintiffs of an individualized opportunity to show that material critical to their cases should not be disregarded. But the SSA's actual decision to exclude not just the RFC forms, but also the four doctors' entire medical reports, is even more troubling.

The dissent, however, argues that we have never held that hearings under § 405(b)(1) are formal adjudications and have only said so in dicta. See Dissent at 823-24 (discussing Mullen v. Bowen , 800 F.2d 535, 536-37 & n.1 (6th Cir. 1986) (en banc) ). Although the SSA noted that the statement was dicta, it did not advance an argument that § 405(b)(1) hearings are not in fact formal adjudications. See SSA Reply Br. at 36. We therefore do not address such an argument.

The dissent also maintains that redeterminations under § 405(u) are not governed by § 405(b)(1). Dissent at 823-25. The SSA has not advanced this argument. Rather, it maintains that "the redetermination process as implemented by SSA [ ] provides the protections guaranteed by § 405(b)(1)." See SSA Reply Br. at 36-37. Because the SSA has not made the argument presented by the dissent, we do not entertain it.

The SSA appears to read Richardson v. Perales , 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), as holding that any procedure that complies with 42 U.S.C. § 405(b) necessarily comports with the APA. See SSA Reply Br. at 37. But the Perales Court actually explained that it "need not decide whether the APA has general application to social security disability claims"-a point this circuit has since decided in the affirmative-because "the social security administrative procedure does not vary from that prescribed by the APA." Id. at 409, 91 S.Ct. 1420. The Court explained that the protections laid out in § 556(d) of the APA "conform, and are consistent with, rather than differ from or supersede, the authority given the Secretary by the Social Security Act[ ]." Id. In effect, the Court held that § 405(b)(1) encompasses the protections laid out in, at the very least, 5 U.S.C. § 556(d). The SSA therefore cannot combat the charge that it failed to comply with the APA by asserting that it complied with 42 U.S.C. § 405(b)(1). If the SSA shirked its responsibilities under one act, it shirked its same responsibilities under the other.

Plaintiffs raise three additional purported violations of the APA's requirements for formal adjudications. First, plaintiffs contend that the SSA "imposed" a "sanction" on plaintiffs based on evidence outside the record, in violation of 5 U.S.C. § 556(d), by disregarding portions of plaintiffs' medical records based on the evidence underlying the OIG's fraud assertion, which does not appear in the record. Pls. Br. at 53-54. Second, plaintiffs argue that they were barred from "conduct[ing] such cross-examination as may be required for a full and true disclosure of the facts," in violation of § 556(e). Pls. Br. at 53-54. Finally, plaintiffs argue that the SSA violated § 554(d)(2), which precludes an ALJ presiding over a redetermination hearing from "be[ing] responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency."5 U.S.C. § 554(d)(2). Because we conclude that the SSA violated the APA in at least one way, we need not decide whether these other allegations amount to additional APA violations. We therefore decline to do so here.

The dissent argues that plaintiffs forfeited their arbitrary-and-capricious claim because they did not raise it meaningfully below. See Dissent at 825-27. We conclude that the argument was sufficiently raised below to be preserved for appeal because it was not addressed "in a perfunctory manner, unaccompanied by some effort at developed argumentation" and plaintiffs did not merely "mention a possible argument in the most skeletal way." McPherson v. Kelsey , 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n , 59 F.3d 284, 293-94 (1st Cir. 1995) ). Plaintiffs quoted, juxtaposed, and analyzed the two relevant provisions, and argued that there was no reason why "a beneficiary's evidentiary rights depend on which of the Defendant's employees happen to develop a belief about the beneficiary's award." 16-cv-154 (Hicks), R. 22 (Pl.'s Mot. for Partial Summ. J. and Mem. in Supp. at 27) (Page ID #1076). In another filing, plaintiffs reiterated the argument, cited 5 U.S.C. § 706(2)(A), and argued that such conduct constituted "improper agency action in its own light." 16-cv-35 (Perkins), R. 17-1 (Mem. of Law in Supp. of Mot. for Prelim. Inj. at 12 n.7) (Page ID #287).

In one of the district court proceedings below, the SSA described the relevant HALLEX provisions as "interpretative rules" that "merely restate and interpret [42 U.S.C. §] 1383(e)(7) 's mandate that the agency redetermine eligibility for supplemental security income if there is a reason to believe that fraud was involved in an individual's application, and when redetermining eligibility, disregard evidence if there is reason to believe that fraud was involved in the provision of the evidence." 16-cv-101 (Griffith), R. 33 (Acting Comm'r's Reply in Supp. of Her Partial Mot. to Dismiss Pls.' Compl. at 11) (Page ID #286). Here, we presume that, as the SSA alleges, the provisions at issue are in fact interpretive rules. See Perez v. Mortg. Bankers Ass'n , --- U.S. ----, 135 S.Ct. 1199, 1210, 191 L.Ed.2d 186 (2015) (treating an agency interpretation as an "interpretive rule" because "the parties litigated this suit on [that] understanding").

The SSA argues that plaintiffs forfeited this argument by not raising it below. However, Hicks raised the point in her motion for partial summary judgment. 16-cv-154 (Hicks), R. 22 (Mot. for Partial Summ. J. at 27) (Page ID #1076) (noting the distinction between the OIG's fraud assertions and the SSA's fraud assertions and arguing that "[t]here is no statutory or regulatory basis for this distinction. Its arbitrary nature-that a beneficiary's evidentiary rights depend on which of the Defendant's employees happens to develop a belief about the beneficiary's award-itself suggests a due process of Administrative Procedure Act violation." (citing 5 U.S.C. § 706(2)(A) ) ). Perkins raised the same point in a footnote. 16-cv-35 (Perkins), R. 17-1 (Mem. of Law in Supp. of Mot. for Prelim. Inj. at 12 n.7) (Page ID #287) ("To create a dichotomy in how redetermination claims are treated based on the source of the factual allegations is not only arbitrary and capricious, but also unmoored from any law-and thus improper agency action in its own light." (citing 5 U.S.C. § 706(2) ) ). Although true that "an argument is not raised where it is simply noted in a footnote absent any recitation of legal standards or legal authority," Calvert v. Wilson , 288 F.3d 823, 836 (6th Cir. 2002), here, plaintiffs raised the point both in the text of one memorandum and in a footnote of another, and in both instances, plaintiffs included citation to the relevant statutory provision. We therefore treat the argument as preserved on appeal.

Plaintiffs argue that "Auer deference is unwarranted for agency positions 'adopted in response to litigation,' " Pls. Reply Br. at 22-23, but the Supreme Court has not announced such a blanket rule. It has instead explained that Auer deference is "unwarranted when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question,' " which "might occur" when an agency's interpretation "is nothing more than a 'convenient litigating position.' " Christopher v. SmithKline Beecham Corp. , 567 U.S. 142, 155, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) (first quoting Auer v. Robbins , 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) ; then quoting Bowen v. Georgetown Univ. Hosp. , 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ). Here, where the SSA's interpretation accords fully with the statutory text, deference-to the extent deference is even necessary in light of the unambiguous text-is owed.

As Social Security Rulings presumably lack the force of law, they do not warrant Chevron deference. Smith v. Aegon Cos. Pension Plan , 769 F.3d 922, 927 (6th Cir. 2014). Barnhart v. Walton , 535 U.S. 212, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002), is not to the contrary. There, the Court determined that an agency's interpretation of its statute, as announced in "formal regulations," deserved Chevron deference, even though the interpretation first appeared in a Social Security Ruling. Id. at 219-21, 122 S.Ct. 1265.