# United States Court of Appeals
# for the Federal Circuit

---

**ROBERTO RAMIREZ,**
*Petitioner*

**v.**

**DEPARTMENT OF HOMELAND SECURITY,**
*Respondent*

---

2019-1534

---

Petition for review of an arbitrator's decision by Don B. Hays.

---

Decided: September 15, 2020

---

JESSICA HORNE, Office of General Counsel, National Treasury Employees Union, Washington, DC, argued for petitioner. Also represented by LARRY JOSEPH ADKINS, GREGORY O'DUDEN.

ERIN MURDOCK-PARK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by ETHAN P. DAVIS, ROBERT EDWARD KIRSCHMAN, JR., LOREN MISHA PREHEIM.

---

Before NEWMAN, BRYSON, and REYNA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* REYNA.

Concurring Opinion filed by *Circuit Judge* BRYSON.

REYNA, *Circuit Judge*.

The petitioner, Roberto Ramirez, seeks review of an arbitrator's final award sustaining his removal from his job as a Customs and Border Protection Officer for the Department of Homeland Security. Mr. Ramirez contends that the arbitrator lacked the authority to order another psychiatric evaluation after stating, in an interim award, that the prior evaluations failed to preponderantly establish that Mr. Ramirez was unfit for duty. Mr. Ramirez further contends that he was denied due process when the agency refused to provide him with the records of the written psychological assessments underlying his psychiatric evaluations. We hold that the arbitrator did not exceed his authority by seeking additional evidence after issuing his interim award. We also hold, however, that Mr. Ramirez was entitled to a meaningful opportunity to review and challenge the written assessments underlying his adverse psychiatric evaluations. Thus, we vacate the final award and remand for further proceedings.

## BACKGROUND

Up until his removal in 2016, Roberto Ramirez served as a Customs and Border Protection ("CBP") Officer for the Department of Homeland Security ("the Agency"). The role required him to carry a service firearm and to remain medically qualified to do so.

The events leading to Mr. Ramirez's termination began on the morning of January 26, 2014, when shortly after he left the house following a heated argument, his wife called the police and reported that he had cocked his service weapon and pointed it at her head. Mr. Ramirez denied the allegation. The police later concluded that the

allegations were "[u]nfounded," and Mr. Ramirez was not charged with any crime.  J.A. 63.

### Investigation and Removal

In response to the incident, the Agency temporarily revoked Mr. Ramirez's authority to carry a firearm and required him to complete a fitness-for-duty evaluation, which included a psychiatric evaluation.  His first evaluation was inconclusive.  The examining psychiatrist, Brian Skop, reported that he obtained no evidence that Mr. Ramirez was "unable to safely, efficiently, and reliably perform all of the duties without restrictions."  J.A. 70.  At the same time, however, Dr. Skop could not "confidently say" that Mr. Ramirez was "safe to carry a government issued weapon" because there was evidence that he was not "totally forthcoming" during the assessment.  *Id.*

After receiving Dr. Skop's report, the Agency ordered a second evaluation by a different psychiatrist, Larry Nahmias.  Dr. Nahmias was also unable to assess Mr. Ramirez's dangerousness or his ability to safely carry a government-issued weapon.  J.A. 77–78.  Nonetheless, Dr. Nahmias recommended that Mr. Ramirez be "restricted from any weapons carrying position" based on his "lack of full cooperativeness" during his evaluation. J.A. 77–78.

In reaching their medical opinions, Dr. Skop and Dr. Nahmias each relied on results from a written assessment that Mr. Ramirez completed as part of each evaluation. These assessments were versions of the Minnesota Multiphasic Personality Inventory ("MMPI"),[1] a test frequently used to aid in the diagnosis of mental disorders, and each

---

[1]    As part of Dr. Skop's evaluation, Mr. Ramirez completed the MMPI-2 version of the assessment, and as part of Dr. Nahmias's evaluation, Mr. Ramirez completed the MMPI-2 RF version.

assessment consisted of a series of true-or-false questions about Mr. Ramirez's emotions, attitudes, thinking, and behaviors. Neither Dr. Skop nor Dr. Nahmias interpreted the MMPI assessments himself. Instead, the assessments were tabulated and interpreted by a third-party clinical psychologist, Richard Frederick, who compiled a report for the psychiatrists' review. According to Dr. Skop's and Dr. Nahmias's reports, Dr. Frederick interpreted the results of each assessment as "invalid" due to "extreme defensiveness":

> On the MMPI-2, Dr. Frederick indicates that Officer Ramirez was extremely defensive when he completed the questionnaire. He denied having any significant psychological problems. He wants to be seen as highly emotionally controlled, highly virtuous, tough and effective, and gregarious. He did not cooperate in the assessment by providing an open and forthcoming account of his emotions, attitudes, behavior, or thinking. Consequently, his responses are not interpretively useful. The test is invalid due to extreme defensiveness.

J.A. 68 (Dr. Skop's report); *see also* J.A. 76 (Dr. Nahmias's report) ("The interpretation of his MMPI-2 RF by Dr. Frederick is that it is invalid because he was extremely defensive and closed when he selected his responses. He did not cooperate in the assessment by providing an open and forthcoming account of his attitudes, emotions, behavior or thinking.").

Both Dr. Skop's and Dr. Nahmias's conclusions that Mr. Ramirez had been uncooperative during his evaluations were based on Dr. Frederick's interpretation of the MMPI assessments. Other than Dr. Frederick's findings, neither Dr. Skop nor Dr. Nahmias identified any other ground in their reports for concluding that Mr. Ramirez was evasive or uncooperative. Nor did their in-person examinations reveal any indication that he suffered from a

mental condition that compromised his judgment or his ability to safely handle a firearm. Moreover, there is no dispute that Mr. Ramirez answered every question of his MMPI assessments as requested; Dr. Frederick's finding of defensiveness was based solely on the answers Mr. Ramirez selected for the questions.

Based on Dr. Nahmias's report, the Agency determined that Mr. Ramirez was no longer fit for duty and proposed his removal. J.A. 80–83. Specifically, the deciding officer relied on Dr. Nahmias's recommendation that Mr. Ramirez be restricted from any weapons-carrying position. J.A. 81. The officer further considered that Mr. Ramirez was "given a second opportunity to be more forthcoming in [his] evaluation" and that Dr. Nahmias nonetheless found Mr. Ramirez to be "extremely defensive" and not fully cooperative in the second assessment. *Id.* The Agency provided Mr. Ramirez with copies of Dr. Skop's and Dr. Nahmias's reports but did not provide him access to the MMPI assessments or their interpretation by Dr. Frederick.

After several months, during which Mr. Ramirez contested the proposed removal orally and in writing through his union representative, the Agency issued a decision letter officially removing Mr. Ramirez. The decision again cited Dr. Nahmias's finding that Mr. Ramirez was defensive and uncooperative in his psychiatric evaluation. J.A. 86. Pursuant to the collective bargaining agreement between his union and the Agency, Mr. Ramirez elected to challenge his removal through arbitration rather than through an appeal to the Merit Systems Protection Board.

### Arbitration

The parties presented the arbitrator with the following questions for resolution: (1) whether the Agency had just cause to remove Mr. Ramirez and (2) if not, the appropriate remedy.

The arbitrator held two hearings during which the parties presented evidence and live testimony. Before the hearings, counsel for Mr. Ramirez requested from the Agency copies of Mr. Ramirez's MMPI assessments and Dr. Frederick's tabulation and interpretation of the scores. J.A. 90–92. The Agency denied the requested records on the grounds that it had never obtained them from Dr. Frederick.

Mr. Ramirez's counsel then objected to the Agency's introduction of evidence during the hearing that relied on the MMPI assessments, including the reports of Dr. Skop's and Dr. Nahmias's psychiatric evaluations, on the ground that Mr. Ramirez had been denied access to the test records. J.A. 55, 90. The arbitrator reserved judgment on the objection and allowed the Agency to present its evidence at the hearing. J.A. 55, 90, 92–93.

Mr. Ramirez testified during the hearings that he had been candid in responding to the MMPI assessments and did not know why his responses had been interpreted as uncooperative. J.A. 119–120. He also offered the testimony of his own expert witness, Vittorio Tomas Puente, who administered another MMPI assessment to Mr. Ramirez and interpreted his scores as within a range typically seen among law enforcement personnel. J.A. 191–192. Based on his evaluation, Dr. Puente opined that Mr. Ramirez was fit for duty.

Following the hearings, the arbitrator issued an Interim Award, which ordered Mr. Ramirez to undergo yet another psychiatric evaluation and "defer[red] all aspects associated with a final decision" pending that evaluation. J.A. 34. In concluding that another examination was necessary, the arbitrator declined to credit Dr. Puente's testimony but found that the conclusions of the Agency's medical experts fell "'*technically' short of preponderantly proving* that CBPO Ramirez is currently unfit for CBP service." J.A. 33. At the same time, the arbitrator explained

he was not prepared to take the risk of ordering Mr. Ramirez's reinstatement because the totality of the evidence indicated that he had caused the medical uncertainty by deliberately masking his actual mental state. J.A. 33–34. Thus, the arbitrator deferred his decision pending the availability of a "*clear and conclusive opinion*" regarding Mr. Ramirez's psychological fitness for duty based on a new evaluation. J.A. 34. The arbitrator further provided that if the new evaluation showed that Mr. Ramirez remained uncooperative, then the arbitrator was "prepared to draw a *material and adverse inference*" against Mr. Ramirez when reaching a final decision. J.A. 34–35. The Interim Award did not address Mr. Ramirez's objections to the Agency's medical evidence based on its failure to produce the MMPI records.

Mr. Ramirez appealed the Interim Award to this court, challenging the arbitrator's jurisdiction to order another evaluation. This court dismissed the appeal for lack of jurisdiction because the award was not final for purposes of judicial review. *Ramirez v. Dep't of Homeland Sec.*, No. 18-1371 (Fed. Cir. Feb. 22, 2018) (per curiam), J.A. 121–124.

Thereafter, in July 2018, Mr. Ramirez reported for another fitness-for-duty evaluation, which was conducted by another psychiatrist, Donna Yi. As part of the evaluation, Mr. Ramirez completed another MMPI assessment, which was reviewed by the same psychologist, Dr. Frederick, who again interpreted the results as invalid "because of high defensiveness." J.A. 140. Based on this interpretation and a review of the full record, Dr. Yi concluded that "a determination of the employee's potential dangerousness to himself or others cannot be made and I cannot declare that he is safe to return to the workplace." J.A. 145.

Following Dr. Yi's evaluation, Mr. Ramirez requested from the Agency a copy of all records related to the evaluation, including the new MMPI assessment. The Agency again denied the request on the ground that it did not

receive the test records from Dr. Yi.    J.A. 125–126.
Mr. Ramirez challenged the Agency's response in a submission to the arbitrator.  J.A. 55–56.  He also renewed his
earlier objections to the Agency's medical evidence and requested that the arbitrator order the Agency to produce the
MMPI records.  *Id.*

Without ordering another hearing, the arbitrator issued a "Final Award" affirming Mr. Ramirez's removal,
this time concluding that the Agency had established by a
preponderance of the evidence that Mr. Ramirez was unfit
to meet the conditions of employment.  J.A. 42–46.  In
reaching his decision, the arbitrator determined that "Dr.
Yi's professional conclusions . . . , in our judgment, essentially confirmed the disqualifying conclusions previously
expressed by the agency and other psychiatric examiners."
J.A. 43–45.  The arbitrator also denied Mr. Ramirez's request to order the Agency to produce the records of his
MMPI assessments and declined to reopen the evidentiary
record for a new hearing.  *Id.*

Mr. Ramirez petitioned for review by this court.  We
have jurisdiction under 5 U.S.C. §§ 7121(f), 7703(b)(1) and
28 U.S.C. § 1295(a)(9).

## DISCUSSION

As with decisions of the Merit Systems Protection
Board, this court may overturn an arbitrator's ruling only
if it is arbitrary, capricious, an abuse of discretion, contrary
to law, unsupported by substantial evidence, or obtained
without following procedures required by law.  5 U.S.C.
§ 7703(c); 5 U.S.C. § 7121(f); *Do v. Dep't of Hous. & Urban
Dev.*, 913 F.3d 1089, 1093 (Fed. Cir. 2019); *Brook v. Corrado*, 999 F.2d 523, 526 (Fed. Cir. 1993).  On this appeal,
Mr. Ramirez contends (1) that the arbitrator exceeded his
authority by ordering a new psychiatric evaluation and reconsidering the merits of Mr. Ramirez's removal after issuing the Interim Award and (2) that the Agency's denial of
access to the records of the MMPI assessments deprived

Mr. Ramirez of due process. We address these arguments in turn.

I

Mr. Ramirez contends that the arbitrator's jurisdiction over his case terminated once the arbitrator had evaluated the parties' evidence and stated that the expert opinions proffered by the Agency failed to satisfy its burden of establishing just cause by a preponderance of the evidence. At that point, according to Mr. Ramirez, the arbitrator was obligated to order reinstatement and lacked authority to take any other action in the case. We disagree.

Mr. Ramirez's argument relies primarily on the doctrine of *functus officio*, Latin for "task performed," which dictates that once an arbitrator has rendered a final decision on a submitted issue, he has no further authority, absent agreement by the parties, to redecide that issue. *See* 20 WILLISTON ON CONTRACTS § 56:100 (4th ed., May 2020 update); *see also, e.g.*, *United Brotherhood of Carpenters & Joiners of Am. v. Tappan Zee Constructors, LLC*, 804 F.3d 270, 277 (2d Cir. 2015); *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1270–1271 & n.4 (10th Cir. 1999); *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 991 (3d Cir. 1997). Traditionally, the doctrine served to protect the neutral and reasoned judgments reached by arbitrators during their time as "ad hoc judges" in a case from any amendments motivated by ex parte influence that may arise when the arbitrators resume their roles in private life at the end of a case. *See Matlack*, 118 F.3d at 991–92. More recently, courts have questioned the continued applicability of these concerns, particularly in the context of labor disputes, and have crafted exceptions and limitations to the *functus officio* doctrine to more narrowly protect the arbitrator's reasoning about a decision, the distribution of an award, and the parties' expectations about their rights and liabilities. *Id*. at 992.

This court has not previously considered the question of when an interim award by an arbitrator constitutes a final decision that triggers *functus officio*. Other jurisdictions considering the question have held that the finality of an otherwise interim award depends at least in part on whether the award states that it is final and whether the arbitrator so intended. *See Legion Ins. Co. v. VCW, Inc.*, 198 F.3d 718, 720 (8th Cir. 1999) (holding that for purposes of the *functus officio* doctrine, "[w]hether the award indicates that [it] is final and whether the arbitrator intended the award to be final are factors in determining if an arbitration award is final" (second alteration in original) (quoting *Local 36, Sheet Metal Works Int'l Ass'n v. Pevely Sheet Metal Co.*, 951 F.2d 947, 949 (8th Cir. 1992))); *Bosack v. Soward*, 586 F.3d 1096, 1103 (9th Cir. 2009) (adopting the rule that "an interim award may be deemed final for *functus officio* purposes if the award states it is final, and if the arbitrator intended the award to be final"). We agree with our sister circuits that an arbitrator's intent, as expressed in the language of the arbitral award, should guide our assessment of whether an interim award is a final decision that terminates the arbitrator's authority over the issues addressed in the award. When an arbitrator makes clear that an interim award reflects only a preliminary assessment of the evidence and retains jurisdiction to render a final award based on additional evidence, there is little concern that new findings in a subsequent award would defeat the parties' reasonable expectations about their rights and liabilities. In such cases, the arbitrator also retains his role as a neutral adjudicator pending the issuance of the final award, alleviating the potential for intervening ex parte influence. Thus, we hold that an arbitrator does not lose the authority to further consider a submitted issue by announcing an interim finding when the award expressly defers a final decision on that issue pending the availability of additional evidence.

Neither of the decisions relied on by Mr. Ramirez support a different rule. In *U.S. Department of Transportation, FAA, Northwest Mountain Region, Renton, Washington, and National Air Traffic Controllers Association*, the Federal Labor Relations Authority found that an arbitrator lacked the authority to reverse its earlier decision that an agency had violated its collective bargaining agreement. 64 F.L.R.A. 823, 825–26 (2010). There, however, the arbitrator had issued a cease and desist order based on his finding of a violation, thus making clear that he had reached his final decision on the merits. *Id.* at 825. The arbitrator had also expressly limited his remaining jurisdiction to resolving the question of remedy. *Id.* at 826. Similarly, in *Butterkrust Bakeries v. Bakery, Confectionery and Tobacco Workers International Union, AFL-CIO, Local No. 361*, the Eleventh Circuit held that an arbitrator had no remaining authority to order an employee's conditional reinstatement because the arbitrator had unequivocally concluded that the employee's disciplinary record "justified the termination." 726 F.2d 698, 699-700 (11th Cir. 1984). In both cases, it was clear from the arbitrator's decision that he had reached a decisive determination on the question presented and had thereby terminated his own jurisdiction on that question.

Here, in contrast, the Interim Award expressly "deferr[ed] all aspects" of the arbitrator's final decision, including the question of just cause. J.A. 34. While the arbitrator opined that the medical evidence presented by the Agency fell short of satisfying its burden, he did so in the context of explaining the need for additional evidence to resolve the medical uncertainty over Mr. Ramirez's fitness for duty, including whether it was appropriate to draw an adverse inference from the invalidity of his MMPI scores. The Interim Award was therefore not a final decision that terminated the arbitrator's authority to further consider the Agency's justification for Mr. Ramirez's removal. For these reasons, we will not, as Mr. Ramirez

requests, treat the findings in the Interim Award as final and give effect to them by ordering his reinstatement.[2]

## II

We next consider whether Mr. Ramirez was afforded due process in challenging the basis for his removal in light of the Agency's refusal to provide him with access to the records of his MMPI assessments.

In general, public employees possess a constitutionally protected property right in their employment and are entitled to due process at each stage of their removal proceedings. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Stone v. Fed. Deposit Ins. Corp.*, 179 F.3d 1368, 1374–76 (Fed. Cir. 1999). "The essential requirements of due process . . . are notice and an opportunity to respond." *Loudermill*, 470 U.S. at 546. The precise requirements of due process in each case are not "wooden absolutes" and must be judged according to the demands of the particular situation. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir. 1970).

In determining the process due to an individual in a given context, a court must consider (1) the private interest that will be affected by the official action; (2) the risk of an

---

[2]     We decline to address here the separate question of whether, apart from the finality of the findings in the Interim Award, the arbitrator exceeded his authority by ordering Mr. Ramirez to undergo a psychiatric evaluation. While Mr. Ramirez asserts in passing that the new evaluation was "something the parties did not ask for or authorize," Appellant's Br. 15–16, he fails to present any substantive arguments for why an arbitrator lacks the authority to order a new evaluation concerning an employee's fitness for duty under the terms of the parties' collective bargaining agreement and applicable regulations.

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). At the same time, the courts have recognized that one "relatively immutable" principle of due process is that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959); *Hicks v. Comm'r of Soc.*, 909 F.3d 786, 797 (6th Cir. 2018); *see also ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1076 (9th Cir. 2015) (acknowledging that "fundamental fairness—the touchstone to determining whether a plaintiff received due process—requires that a party against whom an agency has proceeded be allowed to rebut evidence offered by the agency if that evidence is relevant." (citations and internal quotation marks omitted)).

This court has not previously decided whether and when due process requires a government agency to provide its employee with the records of psychological testing underlying an adverse fitness-for-duty evaluation that leads to the employee's removal. In comparable circumstances, the Fifth Circuit has held that when a government agency removes its employees based on drug charges established through urinalysis, due process requires that the employees have access to samples of the urinalysis for independent verification. *Banks v. Fed. Aviation Admin.*, 687 F.2d 92, 94–96 (5th Cir. 1982). In *Houston Federation of Teachers, Local 2415 v. Houston Independent School District*, the district court relied on the reasoning in *Banks* in concluding that a school district violates the due process rights of its teachers when it bases retention decisions on the results

of a proprietary assessment without providing the teachers with any opportunity to review and assess the accuracy and validity of the testing data and methodology. 251 F. Supp. 3d 1168, 1178–80 (S.D. Tex. 2017).

We reach a similar conclusion when we assess the evidence at issue in this case in light of the *Mathews* factors and the "immutable" principle of due process announced in *Greene*. Here, the record makes plain that the Agency's removal of Mr. Ramirez was based on Dr. Nahmias's recommendation that he be restricted from carrying a firearm. That recommendation was in turn based primarily, if not exclusively, on Dr. Frederick's interpretation of the MMPI results as invalid for defensiveness. Thus, the soundness of Dr. Frederick's interpretation was critical to the question of whether the Agency had just cause to remove Mr. Ramirez. Dr. Nahmias's recommendation, and the Agency's removal decision, rested on the assumption that Dr. Frederick tabulated the scores correctly and that he applied the appropriate criteria in interpreting the scores. The only way for Mr. Ramirez to verify or challenge those assumptions was to independently review the tests and their interpretation by Dr. Frederick.

Against the critical role of the MMPI records for protecting against wrongful deprivation, the Agency made no showing that it would have been unduly burdensome to obtain and produce those records. There is no record that the Agency even inquired into the possibility of doing so here. While in some instances, "the government's failure to preserve and produce such relevant and material evidence might be excusable upon a showing of good faith and reasonable effort," the fact that the Agency made "no attempt" to obtain the evidence at issue undermines any such conclusion in this case. *See Banks*, 687 F.2d at 96. As the Fifth Circuit recognized in *Banks*, it may be difficult at times to "mark an exact balance between relevance and the attendant procedural burdens in an administrative proceeding"; however, "even the most rudimentary standards

of due process" would afford an employee the opportunity to access and meaningfully challenge the critical and dispositive pieces of evidence asserted against him. *Id.*

In denying Mr. Ramirez's request to order production of the MMPI records, the arbitrator relied on the following reasoning: (1) that the records were not in the Agency's custody, and thus the Agency had no regulatory or contractual obligation to produce them; (2) that the Agency itself did not directly review or consider the records in making its removal decision; (3) that Mr. Ramirez had the opportunity to cross-examine Dr. Nahmias and to present testimony from his own expert; and (4) that two other psychiatrists, Dr. Skop and Dr. Yi, generally concurred with Dr. Nahmias's findings. J.A. 43–45. None of these grounds undermines Mr. Ramirez's due process rights to the records at issue.

*First*, as a government entity defending its decision to deprive an employee of protected employment, the Agency's obligation to provide Mr. Ramirez with the evidence underlying its decision stems from more than its regulatory and contractual obligations for collective bargaining with his union.[3] Rather, the minimum requirements are constitutional. In *Banks*, the court rejected the FAA's contention that "since it was not in possession of the samples, it was under no duty to preserve or order the control of the samples." *Banks*, 687 F.2d at 95. The fact that the Agency contracted for the testing and relied upon it,

---

[3]    While the arbitrator did not identify any specific "[r]egulations" that he reviewed in concluding the Agency was not obligated to produce the MMPI records, J.A. 43, the Agency had based its arguments on 5 U.S.C. § 7114(b), which provides that as part of good faith negotiations with a union, the agency need only provide the union representative with relevant information "normally maintained by the agency in the regular course of business." J.A. 58.

together with the foreseeable importance of the evidence at issue to the employee's defense, obligated the Agency to make the evidence available for independent examination by the employee. *Id.*

*Second*, the fact that the Agency relied indirectly rather than directly on the evidence at issue did not excuse the Agency from making the evidence available to Mr. Ramirez. As the Sixth Circuit recognized in *Hicks*, an agency's determination "depends on fact findings beyond the ultimate factual question at issue, and due process protects a person's right to contest" the basis for the preliminary findings that underlie the agency's ultimate determination. 909 F.3d at 798 (internal quotation marks omitted). Here, the Agency's conclusion that Mr. Ramirez was unfit for duty depended on the preliminary finding that he was defensive and uncooperative in completing his MMPI assessments. The Agency cannot shield the evidence underlying that finding from production by simply relaying it through the report of another expert.

*Third*, the opportunity to cross-examine Dr. Nahmias regarding his reliance on the MMPI results did not satisfy Mr. Ramirez's right to independently review and challenge the results directly. Even if Dr. Nahmias could be questioned on his understanding of the general reliability of MMPI assessments, he did not oversee Dr. Frederick's interpretation of Mr. Ramirez's MMPI assessments and thus could not opine as to whether Dr. Frederick tabulated the responses accurately or interpreted them according to appropriate criteria—questions that are critical to the propriety of the Agency's removal decision in this case. Similarly, while Mr. Ramirez's own expert, Dr. Puente, could administer and interpret a new MMPI assessment according to his own criteria, his interpretation could not address—and indeed rendered all the more material—the question of what methods and standards Dr. Frederick applied in reaching the interpretations that were relied upon by the Agency's experts and the arbitrator.

*Fourth*, these concerns were not alleviated by the concurring opinions of the three evaluating psychiatrists. All of them relied on the interpretation of Dr. Frederick for their analysis, and none of them independently assessed his work. The repeated evaluations did nothing to diminish the likelihood of a fundamental error in Dr. Frederick's analysis.

In contending that Mr. Ramirez was nonetheless afforded adequate process, the Agency raises one additional argument not addressed by the arbitrator: that Mr. Ramirez could have tried to obtain the records himself from Dr. Nahmias or Dr. Frederick. We are unpersuaded. While in certain contexts, an individual who fails to avail himself of established procedures for obtaining evidence is precluded from later complaining about his lack of access to that evidence, *see, e.g.*, *Richardson v. Perales*, 402 U.S. 389, 405 (1971), there was no reasonable expectation here that Mr. Ramirez would have been able to obtain the MMPI records without the Agency's cooperation. Neither Dr. Nahmias nor Dr. Frederick had a treating relationship with Mr. Ramirez; they were engaged for the purpose of responding to the Agency's inquiries. J.A. 96. Moreover, the Agency points to no process by which Mr. Ramirez could have compelled records from these third parties in time for independent review in advance of a hearing. *Cf. CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706–07 (9th Cir. 2017) (holding that a district court is not permitted under section 7 of the Federal Arbitration Act, 9 U.S.C. § 7, to enforce an arbitrator's order compelling pre-hearing document discovery from a non-party to the arbitration). Thus, the mere fact that Mr. Ramirez could have *asked* Dr. Nahmias and Dr. Frederick to provide the MMPI records, with no way of obligating them to so, does not relieve the Agency of its obligation to produce the evidence that formed the basis for its removal decision.

For these reasons, the arbitrator legally erred in concluding that Mr. Ramirez lacked a due process right to

review and challenge the records of the MMPI assessments underlying the Agency's removal decision. Because Mr. Ramirez was denied this right during arbitration, the Final Award must be vacated, and the case remanded to provide Mr. Ramirez with the process he was owed.

We do not, however, agree with Mr. Ramirez that we must also vacate the Agency's removal decision and order reinstatement with back pay because he was constitutionally entitled to receive his MMPI records *before his removal*. For one, there is nothing in the record indicating that Mr. Ramirez pressed his request for his MMPI records during pre-removal agency proceedings. The parties also did not submit for arbitration the question of whether, independent of the merits of the Agency's decision, deficiencies in the Agency's pre-removal process constituted a basis for overturning his removal. Nor is there any other indication in the record on appeal that Mr. Ramirez briefed or otherwise asserted this argument before the arbitrator. Rather, the record only shows that he objected to the Agency's introduction of evidence relying on the MMPI records when he had no access to them and requested an order for the Agency to produce them for independent review.

We are not persuaded that the Agency's failure to provide Mr. Ramirez with his MMPI records before his termination constituted a constitutional violation that cannot be remedied through adequate post-termination procedures. The Supreme Court has recognized that post-termination proceedings may adequately protect a government employee's interest in tenured employment. *Loudermill*, 470 U.S. at 546–547. When a full post-termination hearing is available, pre-termination proceedings "need not definitively resolve the propriety of the discharge," and should only serve as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46. This includes oral or written notice of the

charges against him, an explanation of the employer's evidence, and an opportunity for the employee to present his side of the story. *Id.* To require more than this before termination "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* at 546; *see also Stone*, 179 F.3d at 1375–76. While we have held that certain due process deficiencies in pre-removal proceedings, such as ex parte communications, warrant vacating the removal proceedings in their entirety, such violations must be "so substantial and so likely to cause prejudice that no employee can fairly be required to be subjected to a deprivation of property under such circumstances." *Stone*, 179 F.3d at 1377.

Here, before Mr. Ramirez was terminated, he was notified of the Agency's proposal to remove him based on the conclusions of his psychiatric evaluations, and he had received the reports of these evaluations, which informed him that they relied on MMPI results that neither he nor the Agency had reviewed first-hand. That information explained the basis for the Agency's decision and allowed him to challenge that decision by pointing out ways in which the underlying evidence may have been unreliable. While he was ultimately entitled to independently review the MMPI results with the assistance of his own expert to test their validity and reliability, the fact that he was unable to do so during the preliminary pre-removal proceedings is not "so substantial and so likely to cause prejudice" as to independently justify vacating the removal decision, so long as he is ultimately afforded an opportunity to do so during post-removal arbitration. *Stone*, 179 F.3d at 1377.

For these reasons, we hold that when an agency relies, directly or indirectly, on the results of a psychological assessment in justifying an employee's removal, the agency must provide the employee with a meaningful opportunity to review and challenge the data, analysis, and results of that assessment. Because Mr. Ramirez was denied this opportunity, the Final Award must be vacated.

We do not address here the question of what remedies would be acceptable should the parties discover, upon remand, that the relevant records are no longer available. That would be an assessment to be made by the arbitrator in the first instance, should the need arise. While, as the concurrence notes, the considerations set forth in *California v. Trombetta*, 467 U.S. 479 (1984), may provide some guidance on the requirements and remedies of due process where relevant evidence is destroyed, there are critical distinctions between this case and *Trombetta*.

First, in concluding that the missing breath samples in *Trombetta* were unlikely to be exculpatory, the Court relied on the fact that the breathalyzer used in the analysis had been widely validated for accuracy in assessing blood alcohol levels and that the error rates were known to be low. *See* 467 U.S. at 490. Here, there is no evidence in the record that the validity scales of the MMPI test have ever been scientifically validated to show how often, and under what circumstances, "defensiveness"-based invalidity is a reliable indicator of willful uncooperativeness that warrants an adverse inference as to a person's psychiatric fitness.

Second, in *Trombetta*, the defendants had access to the most pertinent evidence concerning the most likely sources of error in the breath analysis: for calibration errors, inspection of the machine and calibration logs; for external radio and chemical interference, investigation of external sources of radio waves and the dieting state of the defendants; for operator error, cross-examination of the police officers who administered the test. *Id.* Here, the record indicates that one of the most likely sources of error in Dr. Frederick's interpretation is the possibility that he used a validity range that did not account for the typical scores found among law enforcement officers. Yet, Mr. Ramirez had no way to determine what numerical criteria Dr. Frederick applied in reaching his interpretations of MMPI responses at issue here.

Third, *Trombetta* was decided in a context where a retrial with adequate government disclosures was not possible, and a recognized due process violation could only be remedied by barring further prosecution of a crime or suppressing the state's most probative evidence—"troubling choices" that would likely allow an alleged crime to go unprosecuted and a potentially dangerous individual to go free. *Id.* at 486–87. Here, the basis for Mr. Ramirez's removal was not any alleged crime or misconduct, but failure to maintain a condition of employment. Reinstatement in this case does not preclude the Agency from ensuring that its weapons-carrying employees are fit for duty. If the MMPI records are unavailable and the arbitrator determines that reinstatement is the only acceptable remedy, then the Agency can reevaluate Mr. Ramirez's fitness immediately upon reinstatement. At that point, the Agency can remove him again with adequate process, if the evidence warrants doing so, without ever putting a gun back in his hand.

## CONCLUSION

We have considered the parties' remaining arguments and find them to be either waived or without merit. For the reasons discussed, we vacate the arbitrator's Final Award and remand for further proceedings. On remand, the arbitrator must order the Agency to provide Mr. Ramirez or his designated agent with access to the records of his MMPI assessments, including the assessments themselves, his responses, and Dr. Frederick's interpretations. The arbitrator must also provide Mr. Ramirez with an opportunity to present new evidence and testimony at a hearing concerning these records, and all evidence must be considered before issuing a new award.

### VACATED AND REMANDED

#### COSTS

No costs.

# United States Court of Appeals
# for the Federal Circuit

---

**ROBERTO RAMIREZ,**
*Petitioner*

**v.**

**DEPARTMENT OF HOMELAND SECURITY,**
*Respondent*

---

2019-1534

---

Petition for review of an arbitrator's decision by Don B. Hays.

---

BRYSON, *Circuit Judge*, concurring.

I agree with the court that the arbitrator's interim ruling did not constitute a final decision that barred the arbitrator from conducting further review in the matter before him. I also agree with the court that this case must be remanded to the arbitrator for further proceedings on the due process issue. While I agree with much of what Judge Reyna has written in his thoughtful opinion for the court, I would couch the remand directive in somewhat different terms.

The court concludes that Mr. Ramirez was denied due process when he was unable to obtain access to the MMPI-2 tests that he took during each of his fitness for duty examinations and to the scoring of those tests done by an

independent expert.[1]  The remedy, according to the court, is to remand for the arbitrator to order the production of the test results and the scoring of the tests done by the expert.  I agree with much of the court's analysis, but I disagree with the court's remand order in one respect.

In my view, the remand order should require the agency to ascertain whether the test results and scoring reports are available, and to direct the agency to attempt to obtain those items if they are available.  If the agency cannot obtain those materials despite bona fide efforts to do so, however, I would treat those materials as unavailable and would analyze the due process issue accordingly.  In that event, in view of the particular circumstances of this case, I would not regard the unavailability of the tests and the scoring results as necessarily having deprived Mr. Ramirez of a fair opportunity to respond to the case against him.

I

The agency arranged for three different psychiatrists to examine Mr. Ramirez.  In addition, the agency arranged for a fourth psychiatrist to review certain of the records in the case and to offer a further opinion.  The principal question posed to those experts was whether, in light of a domestic incident involving the alleged use of a weapon by Mr. Ramirez, the experts could conclude that Mr. Ramirez should be qualified to carry a weapon in his official position as a Customs and Border Protection Officer.  Each of the experts declined to state that it was safe for Mr. Ramirez to carry a weapon, and each did so based in large part on a

---

[1]    At different times during the course of his psychological examinations, Mr. Ramirez took the MMPI-2 and the MMPI-2 RF, which is a shorter form of the MMPI-2. The two are referred to here as simply the MMPI or the MMPI tests.

conclusion that Mr. Ramirez was not candid in answering questions about himself when he took the MMPI tests.

In reaching that conclusion, each of the psychiatrists relied on the scoring of the MMPI tests Mr. Ramirez took during each of the sessions with the three psychiatrists. The scorer was Dr. Richard Frederick, a licensed clinical psychologist. Dr. Frederick reviewed Mr. Ramirez's answers to each of the three MMPI tests and concluded in each case that the test was invalid. The tests were invalid, according to Dr. Frederick, because Mr. Ramirez's test responses showed that he was not candid but instead was defensive in the answers he gave. Dr. Frederick did not testify at the hearing, and his scoring reports were not offered into evidence. Rather, the substance of Dr. Frederick's scoring reports was presented to the arbitrator through the written reports of the three psychiatrists who examined Mr. Ramirez and the testimony of one of those psychiatrists, Dr. Larry Nahmias.

Based on the psychiatrists' findings, the agency refused to authorize Mr. Ramirez to carry a service weapon. Because his position as a Customs and Border Protection Officer required him to be qualified to carry a weapon, the agency removed him from his position.

At the hearing before the arbitrator, the agency defended its failure to produce copies of the MMPI tests taken by Mr. Ramirez and the scoring reports for those tests on the ground that the agency did not have those materials in its possession and therefore was not obligated to produce them. It is true that the psychiatrists who examined Mr. Ramirez and administered the tests to him, as well as the expert who scored the tests, were not agency employees. But all of them conducted their assessments of Mr. Ramirez pursuant to contracts that were ultimately funded by the agency. The agency therefore appeared to be in a better position to obtain the materials related to the MMPI tests from the psychiatrists who administered the tests

than was Mr. Ramirez. A bona fide request from the agency for those materials may well have resulted in their production. Instead, the agency simply stood on its position that because it did not have the materials in its possession, it had no obligation to produce them, or even to take steps to attempt to obtain them.

In its brief, the agency reasserts this position. In addition, it argues that the MMPI tests and the scoring results were not of critical importance to the agency's decision that Mr. Ramirez should not be deemed qualified to serve in his position. But neither argument is convincing.

A

Contrary to the agency's argument, the MMPI test results were not simply one factor among many that bore on the psychiatrists' conclusion that Mr. Ramirez was uncooperative during his examinations. Rather, the test results, as analyzed by Dr. Frederick, were given substantial weight by each of the psychiatrists.

Dr. Nahmias, the agency's principal witness at the hearing before the arbitrator, testified that he was unable to determine whether Mr. Ramirez had a mental illness or personality disorder because Mr. Ramirez "wasn't fully cooperative" and "was not forthcoming, and an important part of my evaluation of that, being the MMPI." J.A. 104.[2] Dr. Nahmias added that as to any possible mental illness on Mr. Ramirez's part, "I couldn't come to a conclusion

---

[2] Dr. Nahmias administered the MMPI to Mr. Ramirez. In his report, Dr. Nahmias stated that when interpreting Mr. Ramirez's test responses, Dr. Frederick had concluded that the test was "invalid because he was extremely defensive and closed when he selected his responses. He did not cooperate in the assessment by providing an open and forthcoming account of his attitudes, emotions, behavior or thinking." J.A. 76.

because of his defensiveness about mental illness."  J.A. 104.  Dr. Nahmias further explained that he could not determine that Mr. Ramirez could safely carry a weapon "primarily" because of Mr. Ramirez's "defensiveness and . . . . unwillingness to complete the MMPI-2 RF" and "secondarily" because of Mr. Ramirez's "decision to present himself in the best possible light, his unwillingness to really talk about himself and his own issues with feelings, except to say he didn't have any problems."  J.A. 105.

Neither of the other two examining psychiatrists testified at the hearing, but each submitted a report on which the agency relied in its presentation to the arbitrator.  The first, Dr. Brian Skop, reported that Dr. Frederick had indicated that Mr. Ramirez was

> extremely defensive when he completed the questionnaire.  He denied having any significant psychological problems.  He wants to be seen as highly emotionally controlled, highly virtuous, tough and effective, and gregarious.  He did not cooperate in the assessment by providing an open and forthcoming account of his emotions, attitudes, behavior, or thinking.  Consequently, his responses are not interpretively useful.  The test is invalid due to extreme defensiveness.

J.A. 68.  Based in part on that assessment of Mr. Ramirez's responses on the MMPI test, Dr. Skop concluded that he was not able to obtain evidence of dangerousness.  He added that "there was evidence that the employee was not totally forthcoming during the assessment."  J.A. 69.  Between that and Mr. Ramirez's wife's unwillingness to discuss the details of the incident that led to the referral, Dr. Skop concluded, like Dr. Nahmias, that he could not

confidently say that Mr. Ramirez "is not a potential threat to self or others." *Id.*[3]

The third psychiatrist to examine Mr. Ramirez was Dr. Donna Yi. Like Drs. Skop and Nahmias, Dr. Yi stated that in light of Mr. Ramirez's "limited willingness to accurately disclose clinical information about his thoughts, feelings, and behavior," and his wife's unwillingness to discuss the events that led to the evaluation, she could not find that Mr. Ramirez had the "ability to use proper judgment and execute quick and sound decisions in law enforcement situations to protect himself, the public, and other law enforcement personnel." J.A. 145.

Dr. Yi administered the MMPI test to Mr. Ramirez and relied on Dr. Frederick's scoring of that test. In her report, she included what appears to be a direct quotation from Dr. Frederick's report regarding Mr. Ramirez's MMPI results:

> Minnesota Multiphasic Personality Inventory-2 Restructured Form (MMPI-2 RF)—interpretation (blind) by Richard I. Frederick, PhD:
>
> Approach to the Examination: He answered all the items. He consistently endorsed items of similar content in similar ways. He was highly defensive and guarded when he selected his responses. He characterized himself as a person of exceptional

---

[3]    The agency arranged for another psychiatrist, Dr. Marilyn Price, to review Dr. Skop's report, along with other records in the case. Although Dr. Price did not examine Mr. Ramirez, she noted Dr. Skop's observation that Mr. Ramirez was "extremely defensive when he completed" the MMPI test. Dr. Price reached the same conclusion as Dr. Skop, that there was "insufficient information to form an opinion about [Mr. Ramirez's] fitness to perform the full range of duties safely and reliably from a mental health perspective." J.A. 157–59.

virtue.   For example, he reported that he always
tells the truth, never swears, never gossips, is
never vain, never procrastinates, likes everyone he
meets, never acts rashly, and has manners at home
as good as his manners in public.   He did report
that he has a substance abuse problem.   Otherwise,
he reported that he has no significant mental
health problems.   Because of his highly defensive
approach to the test, his responses do not likely ac-
curately reflect his current attitudes, behavior, or
emotional condition and are therefore not interpre-
tively useful.

Summary:   Invalid for interpretation because
of high defensiveness.

J.A. 140.

## B

The agency contended before the arbitrator, and con-
tinues to argue here, that the agency was not in possession
of the MMPI records and that it was therefore not required
to produce them. Contrary to the agency's argument, how-
ever, the agency's potential access to those materials was
plainly superior to that of Mr. Ramirez.   The agency's ar-
gument that it was not required to produce what was not
in its possession ignores the fact that it may have had ef-
fective control over those materials by virtue of the fact
that the agency had contracted for the psychiatrists' ser-
vices.[4]   Given that contractual relationship, the agency
cannot contend that it need not produce the records simply

---

[4]    The record reflects that the agency procured the
services of the psychiatrists through an intermediary, a
company known as PsyBar.  J.A. 130.  But while the agency
used a third party to retain the psychiatrists, the agency
was the ultimate party responsible for obtaining those ser-
vices.

because it does not have actual physical possession of them. By analogy, in civil discovery, a party cannot avoid producing records simply because it lacks actual physical possession of them, as long as it has the right to gain access to the records from a third party. *See Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984) (holding that "control is the test" for whether documents need to be produced, where control "is defined not only as possession, but as the legal right to obtain the documents requested upon demand"); *see generally* 8B Charles Alan Wright et al., Federal Practice & Procedure § 2210 (3d ed. 2010) ("control" of materials sought in discovery means the legal right or practical ability to obtain them). The same commonsense principle should apply in the due process context as well.

In light of the significance attributed to the MMPI records by the psychiatrists and the agency's potential access to those records, the agency should be required to make a good-faith effort to obtain those materials from the experts who administered and evaluated the tests. If the materials can be produced, the arbitration should be reopened to allow Mr. Ramirez to make whatever use he can of those materials.

II

If it turns out, however, that the MMPI materials have been destroyed or are otherwise unavailable notwithstanding a good-faith request for their production by the agency, the issue becomes not whether the agency has failed to take reasonable steps to produce records that are material to Mr. Ramirez's defense, but whether, in the absence of those records, Mr. Ramirez has been denied a fair opportunity to challenge the agency's evidence against him.

On that issue, the Supreme Court's decision in *California v. Trombetta*, 467 U.S. 479 (1984), provides guidance. In that case, the Court held that due process "does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis

tests at trial" where the defendants had "alternative means of demonstrating their innocence." *Id.* at 490–91.[5]  If there were adequate alternative means by which Mr. Ramirez could challenge the evidence against him in the arbitration proceeding, the unavailability of the MMPI tests and the scoring reports would not deprive Mr. Ramirez of due process.[6]

---

[5]  Even in criminal cases, the Supreme Court has held that, in the absence of bad faith, due process is not violated by the destruction of evidence unless the evidence would "both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendants would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489; *see also Arizona v. Youngblood*, 488 U.S. 51, 56–57 (1988); *Olszewski v. Spencer*, 466 F.3d 47, 57 (1st Cir. 2006) (Dyk, J., sitting by designation).  For purposes of this case, I focus on the "other reasonably available means" element addressed in *Trombetta*.

[6]  In his brief, Mr. Ramirez focused his due process challenge on the hearing before the arbitrator, not on the pre-termination removal hearing before the agency.  In oral argument, counsel for Mr. Ramirez asserted that he was denied due process at both stages.  Setting aside Mr. Ramirez's failure to explicitly challenge the adequacy of the pre-termination hearing in his brief, I agree with the court that his challenge to the pre-termination procedure fails, because he had an opportunity to respond in the pre-termination hearing before the agency and was subsequently afforded a full adversarial  post-termination hearing before the arbitrator.  *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 547–48 (1985) ("all the process that is due is provided by a pretermination opportunity to

In this case, several factors shed light on that question. First, Mr. Ramirez was not deprived of an opportunity to challenge Dr. Frederick's assessments of the MMPI tests. Mr. Ramirez did so by having his own expert conduct and score an MMPI test. Mr. Ramirez's expert then testified at the hearing that the test results did not show that Mr. Ramirez was uncooperative and defensive. Although the arbitrator did not find the testimony of Mr. Ramirez's expert persuasive, Mr. Ramirez was not barred, either by the arbitrator's ruling or otherwise, from introducing evidence as to his state of mind when taking the MMPI tests.

Second, Mr. Ramirez was able to cross-examine Dr. Nahmias, the principal agency witness, at the hearing. In so doing, he was able to point out that in several respects Dr. Nahmias's report and testimony were favorable to Mr. Ramirez. From that testimony, it might have been inferred that Dr. Frederick, who did not examine Mr. Ramirez, was mistaken in his assessment of Mr. Ramirez's cooperativeness when taking the MMPI tests, or that any defensiveness on Mr. Ramirez's part was limited to the test and did not otherwise interfere with the psychiatrists' ability to assess his mental stability.

Third, Mr. Ramirez testified at the hearing that he was not willfully uncooperative in his sessions with the psychiatrists. The arbitrator was thus given an opportunity to weigh Mr. Ramirez's credibility in asserting that he was cooperative both when taking the MMPI tests and when otherwise interacting with the psychiatrists.

Fourth, as noted above, the psychiatrists' reports—and particularly the report of Dr. Yi—appear to contain close paraphrases, if not direct quotes, from Dr. Frederick's scoring reports on the MMPI tests. Depending on whether the

---

respond, coupled with [adequate] post-termination administrative procedures").

psychiatrists confirm that their reports contain the essence, or the very words, used by Dr. Frederick, the absence of Dr. Frederick's actual reports may be immaterial.

These factors make this case more like *California v. Trombetta* and less like *Banks v. FAA*, 687 F.2d 92 (5th Cir. 1982), and *Houston Federation of Teachers, Local 2415 v. Houston Independent School District*, 251 F. Supp. 3d 1168 (S.D. Tex. 2017), on which Mr. Ramirez relies.

In *Trombetta*, the defendants were stopped on suspicion of driving while intoxicated and were given breath-analysis tests. The tests produced positive results, and the defendants were prosecuted. The breath samples were destroyed after testing and were not available for testing by the defendants, who contended that the absence of the breath samples denied them the right to contest the evidence against them and thus violated due process.

The Supreme Court rejected that argument. Among other points, the Court noted that even without access to the destroyed breath samples, the defendants had alternative means to challenge the accuracy of the breath analysis results: they were allowed to examine the testing machines; they had opportunities to show that other factors may have affected the test results; and they were allowed to cross-examine the machine operators to show operator error. *Trombetta*, 467 U.S. at 490.

By contrast, in *Banks* and *Houston Federation of Teachers*, the unavailability of evidence that resulted in the employees being fired was devastating to the employees' efforts to defend themselves. In *Banks*, the employees were fired when their urine samples tested positive for cocaine, and the urine samples were destroyed after testing. The Fifth Circuit held that the laboratory tests "were the only meaningful evidence resulting in the discharges" and that "challenging the laboratory reports was probably the only way the controllers could succeed in their appeal." 687 F.2d at 94. Because of the importance of the samples, the

court held that the government had a duty to ensure the preservation of the samples for the defendants' independent examination if the agency intended to rely upon them. *Id.* at 95.

In *Houston Federation of Teachers*, the school district contracted with a software company to develop a proprietary algorithm that would be used to evaluate teachers' impact on student performance. When the school district terminated certain teachers for ineffective performance based primarily on that algorithm, the teachers requested access to the algorithm to challenge their terminations. The software company, however, refused to reveal the algorithm. 251 F. Supp. 3d at 1177. The court found that the teachers were denied due process because, without access to the algorithm, there was no effective way for the teachers to challenge the removal decisions. *Id.* at 1178–80.

Unlike in *Banks* and *Houston Federation of Teachers*, it is by no means clear that the disputed evidence at issue in this case was destroyed or is otherwise unavailable. While Dr. Nahmias stated in response to a question during the hearing that he would be "reluctant" to provide MMPI results to an employee, J.A. 237, he explained that his reluctance was because he did not wish to provide the MMPI results to an untrained individual who would not understand them. Yet medical records are routinely produced in litigation, under appropriate safeguards, and it would not be difficult to arrange for the MMPI records to be produced to a medical professional representing Mr. Ramirez.

Even if the MMPI evidence has been destroyed or cannot be obtained, *Banks* and *Teachers* do not compel

reversal of the arbitrator's decision in this case.[7]  Due process would require reversal only if the unavailability of the MMPI evidence constitutes a denial of access to evidence that has effectively disabled Mr. Ramirez from challenging the agency's presentation against him.  Accordingly, on remand, if the arbitrator determines that the MMPI evidence is unavailable, I would require the arbitrator to assess whether, notwithstanding the unavailability of that evidence, Mr. Ramirez still had sufficient means to defend against the agency's case for removing him.

For the foregoing reasons, I concur with the decision to vacate and remand in this case but would frame the remand order somewhat differently than the court has done.

---

[7]    In addition, *Banks* was decided before *Trombetta*, in which the Supreme Court held that due process "does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial" where the defendants had "alternative means of demonstrating their innocence."   467 U.S. at 490–91. The Supreme Court's decision in *Trombetta* counsels against applying a broad interpretation of the reasoning in *Banks* to find a due process violation here.  *Id.*; *see also Grimsrud v. Dep't of Transp.*, 902 F.3d 1364, 1366–69 (Fed. Cir. 2018) (Lourie, J., concurring in denial of rehearing en banc).